**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH SNAPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | 1:21-cv-02116 |
| v. | ) | |
| | ) | Judge Bucklo |
| UNUM LIFE INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Snapper ("Snapper") has sued Unum Life Insurance Company of America ("Unum") pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), alleging that Unum improperly terminated his claim for Long Term Disability ("LTD") benefits. Before me are the parties' cross-motions for entry of judgment pursuant to Rule 52 of the Federal Rules of Civil Procedure. For the reasons discussed below, I grant Snapper's motion for judgment and deny Unum's motion.

**RULE 52**

The parties have opted to proceed under Rule 52, which essentially amounts to "a trial on the papers." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885-86 (7th Cir. 2015). Under Rule 52(a), "[i]n effect the judge is asked to decide the

case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery." *Cook Inc. v. Bos. Sci. Corp.*, 333 F.3d 737, 741 (7th Cir. 2003) (quotation marks omitted). The "court reviews the stipulated record, resolves any disputes of fact, and determines the outcome of the case." *Migliorisi v. Walgreens Disability Benefits Plan*, No. 06 C 3290, 2008 WL 904883, at *1 (N.D. Ill. Mar. 31, 2008). Courts in this Circuit have frequently observed that, in the context of ERISA disputes over the denial of benefits, proceeding under Rule 52 may be preferable to motions for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g.*, *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 992 (N.D. Ill. 2003) ("Clearly, it is more efficient to reach the same determination on the same record by skipping cross-motions for summary judgment and proceeding directly to a trial on the papers, where all possible issues can be resolved by the court."); *Marshall v. Blue Cross Blue Shield Ass'n*, No. 04 C 6395, 2006 WL 2661039, at *1 (N.D. Ill. Sept. 13, 2006) (collecting cases).

### REQUEST FOR JUDICIAL NOTICE

Because this is a trial on the papers, it is first necessary to settle a question about the scope of the record. Although the parties initially stipulated to having their motions decided on the existing administrative record, Snapper

later requested that I take judicial notice of a decision subsequently handed down by the Social Security Administration (SSA) granting Snapper's application of Social Security Disability Insurance (SSDI) benefits. *See* Req. Judicial Notice, ECF No. 31. Federal Rule of Evidence 201 provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Snapper maintains that the SSA decision "provides a neutral party's opinion of Snapper's functional capacity status, corroborates his disability status, and demonstrates the weight which should be afforded to his physicians' opinions and other information Snapper submitted to Unum Life with his appeal." Req. Judicial Notice 2-3. ECF No. 31. For several reasons, I deny the request.

First, it is undisputed that, before the SSA decision was issued, the parties expressly agreed that there would be no further discovery. *See* Joint Status Report ¶¶ 2-3 (ECF 14). Unum argues that if it had known that the SSA's decision would be part of the record, it would have conducted additional discovery. Snapper points out that the decision was not issued until after the stipulation and suggests that Unum has not been unfairly prejudiced because it was aware that his SSDI

3

application was pending. Snapper also points out that it
provided Unum with a copy of the decision once it was available.
*See* Req. Judicial Notice 2. According to Unum, however, when
Snapper's counsel provided the decision to Unum, he expressly
stated that he was doing so strictly for settlement purposes.
*See* Def.'s Resp. Br. 13 ("Additionally, during a status hearing
before Magistrate Judge Cummings on March 28, 2022, Snapper's
counsel assured the Court and Unum's counsel that he produced
the Social Security decision for the sole purpose of settlement,
and that he would not be using the Social Security decision in
his Rule 52(a) brief for judgment on the merits."). Snapper does
not dispute Unum's representations on this point.

Second, Unum correctly asserts that the SSA decision is not
properly subject to judicial notice for the purposes that
Snapper wishes. As noted above, Snapper asks that I take notice
of the substance of the decision. Unum rightly points out that,
even if judicial notice of the decision could properly be taken,
it could not be taken for the truth or correctness of the ALJ's
determination. *See, e.g.*, *Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888, 895 (N.D. Ill. 2020) ("A court may
generally take judicial notice of another court or agency's
decision, but only for the limited purpose of establishing the
fact of such a decision, not for the truth of the statements
asserted in the decision."). Moreover, the ALJ in the SSA matter

4

ruled that Snapper was disabled on the basis of both physical and psychological problems. Here, Snapper does not assert any psychological basis for his disability. Accordingly, a favorable decision in the SSA matter would not compel a similar result here.

Finally, and in any event, Snapper has forfeited his request for judicial notice. After filing the request, he essentially dropped the issue and has made no attempt to address any of Unum's arguments on the matter. *See, e.g.*, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."). Accordingly, Snapper's request for judicial notice is denied.

## FINDINGS OF FACT[1]

I now enter the following Findings of Fact and Conclusions of Law in accordance with Rule 52. Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its

---

[1] The following Findings of Fact are based on the Administrative Record, as well as the Proposed Findings of Fact and Conclusions of Law submitted by the parties. Pages of the Administrative Record in this case are Bates-numbered from UA-CL-LTD-000001 to UA-CL-LTD-004569. Since only the last four digits of each Bates number are needed to identify a relevant page, the prefix "UA-CL-LTD" along with the leading zeros have been omitted for simplicity. Thus, for example, citation to the page Bates-numbered UA-CL-LTD-001234 is cited as AR 1234. Citations to the plaintiff's Proposed Findings of Fact are designated "Pl.'s PFF ¶ _," and defendant's Proposed Findings of Fact are designated as "Def.'s PFF ¶ _."

conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."). To the extent that any Finding of Fact may more properly be considered a Conclusion of Law, it shall be so construed, and vice versa. *See, e.g.*, *Fulcrum Fin. Advisors, Ltd. v. BCI Aircraft Leasing, Inc.*, 354 F. Supp. 2d 817, 820-21 (N.D. Ill. 2005).

In August 2013, Snapper began working as a litigation associate with the law firm of Mayer Brown LLP. AR 41, AR 4512. Among the benefits of his employment was long-term disability coverage under the Mayer Brown LLP Health and Welfare Benefits Plan (the "Plan"), which was issued to the firm by Unum. Def.'s PFF ¶ 1.

## A.   Relevant Plan Provisions

The Plan defines "disability" in relevant part as follows:

> The employee is disabled when Unum determines that due to his or her **sickness** or **injury** … [t]he employee is unable to perform the **material and substantial duties** of his or her **regular occupation** and is not working in his or her regular occupation or any other occupation.

AR 151 (emphases in original). The Plan defines "regular occupation" as follows:

> **REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the local economy, instead of how the

6

> work tasks are performed for a specific employer or at
> a specific location.
>
> For attorneys, 'regular occupation' means the material
> and substantial duties that you are performing just
> prior to disability.

AR 181.

The Plan further defines "material and substantial duties"
as duties that "are normally required for the performance of
your regular occupation," and that "cannot be reasonably omitted
or modified." AR 226. In addition, the Plan states (excluding
provisions not relevant here) that benefits terminate either as
of "the date you are no longer disabled under the terms of the
plan" or "the date you fail to submit proof of continuing
disability," whichever is earliest. AR 166.

**B.    Snapper's Medical History**

Snapper's history of back and lower-leg pain problems began
in 2008, when he suffered a herniated disc. The herniation
appears to have had no precipitating event. AR 4512. Snapper was
a second-year law student at the time, AR 917, and missed
considerable class time as a result of the injury, AR 4512. He
"attained disabled student status" for the remainder of his law
school career, AR 917, and was provided with test-taking
accommodations as a result, Pl.'s PFF ¶ 17; AR 4512.

In 2012, Snapper underwent the first of several spinal surgeries, an L5-S1 microdiscectomy.[2] AR 2605. The record does not indicate that Snapper's condition interfered with his work until around September 2016, when he was involved in an automobile accident that aggravated his back and lower left leg pain. AR 1597; AR 2605; AR 4514. On April 8, 2018, Snapper underwent an MRI of his lumbar spine, which "showed a disc bulge with a posterior annular tear and right paracentral disc protrusion on the spinal cord at L4-L5, mild to moderate left subarticular zone stenosis at L5-S1, mild bilateral foraminal stenosis at L5-S1, and a small amount of granulation/scar tissue surrounding the traversing left S1 nerve root." Pl.s PFF ¶ 20 (citing AR 1824).[3]

**C.    Snapper's First Leave of Absence**

---

[2] "Microdiscectomy is a type of minimally invasive spine surgery that allows surgeons to treat a number of spinal disorders such as … [d]egenerative disk [and] [h]erniated disk." Northwestern Medicine, https://www.nm.org/conditions-and-care-areas/treatments/microdiscectomy (last visited February 27, 2023).

[3] "Spinal stenosis happens when the space inside the backbone is too small. This can put pressure on the spinal cord and nerves that travel through the spine. Spinal stenosis occurs most often in the lower back and the neck. Some people with spinal stenosis have no symptoms. Others may experience pain, tingling, numbness and muscle weakness. Symptoms can get worse over time…. People who have severe cases of spinal stenosis may need surgery. Surgery can create more space inside the spine. This can ease the symptoms caused by pressure on the spinal cord or nerves." Mayo Clinic, *Spinal Stenosis*, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961.

In April 2018, Snapper's back and leg pain caused him to take a three-month medical leave of absence from Mayer Brown pursuant to the FMLA. AR 1503-1506; AR 1597. The paperwork in support of the leave request was prepared by Dr. Wellington Hsu, MD, a neurosurgeon at Northwestern Medicine, who was treating Snapper at the time. Dr. Hsu identified Snapper's condition as "Radiating LLE [Left Lower Extremity] pain getting worse over six months," and "lumbar radiculopathy." AR 1504.[4]

On May 10, 2018, Snapper met with Dr. Dost Khan, MD, a pain management specialist at Northwestern Medicine. AR 1602-03. Dr. Khan noted "Pain located in left buttock region with radiation down hamstring into posterior calf and toes. Describes pain as a constant burning pain with some numbness in distal leg." AR 1597. Dr. Khan recommended that Snapper stop taking gabapentin, the pain medication Snapper had been taking at the time, due to its "cognitive side effects," and prescribed Cymbalta instead. AR 1598. Dr. Khan also prescribed Trazadone to treat Snapper's insomnia, which resulted from Snapper's pain. *Id.* In addition, Dr. Khan administered an epidural steroid injection. *Id.*

---

[4] Because physicians' and other medical professionals' notes are often composed in a brisk and rough-and-ready manner, they not infrequently include minor typographical, spelling, and grammatical errors. For the sake of simplicity, I have generally refrained from indicating these errors through use of the notation "sic," except where necessary to prevent confusion or misunderstanding.

On June 15, 2018, Snapper began physical therapy at the Shirley Ryan AbilityLab in Chicago. He was evaluated by Dr. Samuel Chu, MD. AR 1780. According to Dr. Chu's notes, Snapper described his pain "as achy, burning, cramping, stiff, tingling, numbness, dull, tightness, pulling," and stated that "[s]ymptoms are worse with sitting and standing, better with walking and lying down." *Id*. Snapper reported that the pain was "affecting his sleep, concentration, mood." *Id*. In addition, Snapper told Dr. Chu that the steroidal injection administered by Dr. Khan had brought no relief. *Id*.

On June 21, 2018, Snapper met again with Dr. Khan, who noted: "Pain remains in left buttock with radiation down hamstring into posterior calf. Pain remains a constant burning." AR 1590. Dr. Khan administered a second epidural injection to Snapper. *Id*. On June 27, 2018, Snapper had a follow-up visit with Dr. Hsu. Dr. Hsu's notes from the visit state: "I have seen, examined and formulated the plan for the patient. He is a 41-year old male who had lower left extremity radiating pain a few months ago. He has had two epidural injections, with improvement of his pain. He would like to return to work at this time. We will return to work without restrictions." AR 2130. Dr. Hsu recommended that Snapper continue physical therapy. AR 2131.

On or around July 9, 2018, Snapper returned to work at Mayer Brown. AR 2856. On August 2, 2018, he received a third

epidural steroid injection from Dr. Khan, AR 1576-88, and on
October 4, 2018, he received a fourth injection, AR 1580. These
injections appear to have provided relief for only two or three
weeks at a time. AR 1938. On December 6, 2018, Snapper received
a fifth epidural steroid injection from Dr. Khan. AR 1574. At
that time, Dr. Khan referred Snapper for a neurosurgical
consultation. AR 1573.

In the following days, Snapper continued to correspond with
Dr. Khan and his staff electronically. On January 15, 2019, he
messaged Dr. Khan to inform him that the most recent epidural
injection "did not provide any relief and actually caused
additional discomfort. So I am probably unlikely to do another
injection." AR 2078. Snapper and Dr. Khan also discussed various
combinations and doses of pain medications (e.g., Nucynta,
Percocet, gabapentin, Amitriptyline), all of which were
unavailing. On February 3, 2019, Snapper wrote in an email to
Dr. Khan, "My pain is again as it was when we first met if not
worse…. It is constantly burning with a dull stabbing up through
the bottom of my foot up into my leg." AR 2077; *see also* AR 2074
("The leg is burning hot."). And in a message dated February 9,
2018, Snapper reported, "This is bad pain. It's t[o]rture bad."
AR 2071.

Snapper also complained of sleeplessness and nausea due to
the pain and the medication he was using to treat it. *See, e.g.*,

AR 2074 ("I am having a hard time with the pain. For example, despite taking a double dose of the oxy[contin] your office prescribed, I got no sleep this past night. Dozens of times I had fallen asleep only to be woken up moments later from discomfort…. Before I doubled up on the oxy, I lay in bed and became nauseas (sic). Even now I on the edge of nausea. If you could, please advise if it's ok to double or triple the oxy dosage, or if another approach is better."). In other messages, Snapper contemplated having to visit the emergency room due to the pain. *See* AR 2072 (informing Dr. Khan's staff that without "something to knock [the pain] down I'll end up in ER with the same meds. So if the Nucynta fails that's where I'll be Saturday night. Can't believe I have to bicker with you about this."). Snapper also expressed angst about his ability to perform his job due to his pain. For example, on January 15, 2019, he wrote: "Unfortunately, currently I am not doing particularly well. Due to the pain, I am struggling to sleep and stay at work. As before, my days in the work force feel very numbered." AR 2078; *see also* AR 2077 (Snapper writing in a message dated 2/3/19 that he "only made it into the office two days in the past two weeks").

On February 4, 2019, Snapper was examined by neurosurgeon Dr. Nader Dahdaleh. AR 2032. He referred Snapper for additional CT and MRI imaging. AR 2034. Dr. Dahdaleh noted that

"[f]ollowing surgery, [Snapper's] mobility improved; however, the left lower extremity radiating pain persisted. He has done physical therapy with no benefit." AR 2033. The CT and MRIs indicated "posterior endplate osteophytosis, disc bulge, and facet arthropathy results in mild left subarticular zone stenosis at L5-S1, bilateral foraminal narrowing at L5-S1, and abutment of the descending left S1 nerve root, similar to the prior MRIs." Pl.'s PFF ¶ 29 (citing AR 1826-30).

D.    **Snapper's Second Leave of Absence**

Having failed to find relief, Snapper took a second leave of absence from Mayer Brown on or about February 19, 2019. AR 1511-14. He was forty-two years old at the time. Pl.'s PFF ¶ 1. He has not worked in any capacity since that date. Pl.'s PFF ¶ 30; Def.'s PFF ¶ 9.

In support of Snapper's application for leave, Dr. Khan stated:

> Mr. Snapper is unable to work from February 19, 2019 through indefinite. He will be re-evaluated following placement of a spinal cord stimulator. He has a trial scheduled for 3/21/19. If he has a successful trial he will need to have a permanent implant which would require a couple weeks of recovery before considering returning to work. This would likely be at the end of April or beginning of May 2019.

AR 1513.

On February 21, 2019, Snapper was examined by Dr. Khan and Dr. Jason Michaels. AR 1565. Dr. Khan's notes state, "[o]verall,

the patient feels like he is stressed out because his pain is not improving. He is concerned that he may have to live with this amount of pain for the rest of his life. He feels like his quality of life is very poor and he is unable to do the things he enjoys such as exercising, working, swimming." AR 1566. Dr. Khan's notes also state that Snapper had been evaluated by his surgical colleagues and was deemed not to be a candidate for surgery at that time. *Id.* Following the examination, the doctors diagnosed Snapper with "Failed Back Syndrome"[5] and recommended that he participate in a spinal cord stimulator trial. AR 1568-69.[6]

On March 21, 2019, Snapper underwent implantation of the spinal stimulator. AR 1605. At a follow-up visit on March 27, 2019, he reported to Dr. Melissa Murphy, MD, that the device had

---

[5] "After any spine surgery, a percentage of patients may still experience pain. This is called failed back or failed fusion syndrome, which is characterized by intractable pain and an inability to return to normal activities. Surgery may be able to fix the condition but not eliminate the pain." Cedars-Sinai Medical Center, *Failed Back and Failed Fusion Syndrome*, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/failed-back-and-failed-fusion-syndrome.html.

[6] "Spinal cord stimulators consist of thin wires (the electrodes) and a small, pacemaker-like battery pack (the generator). The electrodes are placed between the spinal cord and the vertebrae (the epidural space), and the generator is placed under the skin, usually near the buttocks or abdomen. Spinal cord stimulators allow patients to send the electrical impulses using a remote control when they feel pain. Both the remote control and its antenna are outside the body." Johns Hopkins Medicine, Spinal Cord Stimulator, https:// www.hopkinsmedicine .org/ health/treatment-tests-and-therapies/treating-pain-with-spinal-cord-stimulators.

not only failed to improve his condition but had in fact worsened it. Dr. Murphy noted, "[o]verall patient states that he received no relief from the trial and is frustrated by sleep deprivation from having an external battery." AR 1563. At that time, the stimulator was removed. *Id.*

Although Snapper had previously been informed that he was not a good candidate for surgery, he sought a second opinion. On April 16, 2019, he was examined by Dr. Frank Phillips, a neurosurgeon at the Gold Coast Surgery Center in Chicago. AR 1837. Dr. Phillips found that Snapper "has a normal posture of the spine, normal gait. He is able to heel and toe walk. He has a normal posture to his spine." AR 1839. During the visit, Dr. Phillips reviewed Snapper's February 14, 2019, MRI and observed that Snapper "has some disk desiccation with maintained disk height at L4-5. At L5-S1, there is advanced disk space collapse with Modic changes.[7] On the axial view at L5-S1, there is evidence of a left-sided hemilaminotomy.[8] There is a central

---

[7] "Modic changes (MC) are bone marrow lesions on magnetic resonance imaging (MRI), suggestive of being associated with low back pain (LBP)." F.P. Mok, et al., "Modic Changes of the Lumbar Spine: Prevalence, Risk Factors, and Association with Disc Degeneration and Low Back Pain in a Large-Scale Population-Based Cohort," 1 *Spine J.* 16 (2016).

[8] "A laminotomy is a minimally invasive, outpatient surgical procedure performed to widen the spinal canal where it has been narrowed by a thickening of the lamina, the thin bony layer that covers and protects the spinal cord. The lamina may thicken due to traumatic injury or degeneration, compressing the spinal nerves and resulting in pain and disability. A hemilaminotomy is a procedure during which the

15

disk-osteophyte[9] complex, perhaps contacting the left S1 nerve root. There appears to be edema of the S1 nerve root." AR 1839. Dr. Phillips also reviewed Snapper's February 7, 2019, CT scan. He opined that the imaging "confirms disk space narrowing at L5-S1. There are bony osteophytes off the posterior aspects of L5 and S1…. On the axial images, there is central disk-osteophyte at L5-S1 visualized. There is some facet hypertrophy with some resultant narrowing in the left lateral recess." *Id*.

Dr. Phillips discussed with Snapper the possibility of performing an "L5-S1 decompression foraminotomy with removal of the disk osteophyte complex and foraminotomy." AR 1839. However, Dr. Phillips noted, we "discussed that surgical decompression has an unpredictable chance of success, and I have emphasized …. that possibly it could be worsened or not improved at all after the surgery, and he understands this. He is absolutely at the end of his road and he has exhausted conservative treatment and is wishing to willing to try surgery." *Id*. Snapper made a tentative appointment to have the surgery with Dr. Phillips.

---

neurosurgeon removes the lamina only on one side of the spinal canal, the side that requires decompression." MedDiagnostics Rehab of South Florida, *Hemilaminotomy*, https://www.meddiagnosticrehab.co /hemilaminotomy.php.

[9] Osteophytes are bone spurs, "smooth, bony growths, usually near joints." Cleveland Clinic, *Bone Spurs (Osteophytes)*, https://my.clevelandclinic.org/health/diseases/10395-bone-spurs-osteophytes

In the meantime, Dr. Phillips referred Snapper for an electrodiagnostic test to assess for lumbar radiculopathy. AR 1841. The testing was conducted by Dr. David Cheng of Midwest Orthopaedics at Rush University Medical Center. *Id*. Although some of the test's results were unremarkable, Dr. Cheng noted: This is an ABNORMAL examination. There is electrophysiologic evidence of "Chronic left S1 radiculopathy …. most consistent with reinnervation with recent or ongoing axonal loss vs incomplete re-innervation." AR 1841 (capitalization in the original).

On May 14, 2019, Snapper sought the opinion of another surgeon, Dr. Alpesh Patel, MD, at Northwestern Medicine, to discuss potential surgical options. AR 1936. Snapper again described his pain as "radiat[ing] from his buttock on the left side down the back of his thigh, calf, and into the bottom of his foot. He states a burning pain throughout his leg as well as the numbness." AR 1937-38. Dr. Patel's notes also state that Snapper had undergone physical therapy "with worsening pain." AR 1938. Dr. Patel, along with Physician's Assistant Jeremy Larva, recommended against surgery. See AR 1939 ("We have recommended against any surgical intervention at this time due to the fact we do not feel that it would improve his symptoms. We are worried about the chronicity of his nerve pain and longstanding damage to the nerve. We did not see any evidence of persistent

17

nerve compression. We also discussed that surgery may indeed make his symptoms worse.").

On May 20, 2019, Snapper had yet another surgical consultation, this time with Dr. George Cybulski, MD, a neurosurgeon at Northwestern Medicine. AR 1930. Dr. Cybulski examined Snapper's most recent MRI and CT images, which "show[ed] that the foramen is open on the left and there is no recurrent disc herniation which is compressing his nerve root." AR 1931. On this basis, Dr. Cybulski did not recommend further surgery. *Id*.

**E.    Treatment by Dr. Daniel Laich**

On May 23, 2019, seeking a fourth opinion regarding the possibility of surgery to alleviate his condition, Snapper met with Dr. Daniel Laich, a neurosurgeon at Swedish Covenant Medical Group in Chicago. AR 1553. According to Dr. Laich's notes, Snapper complained of:

> left leg pain, numbness and weakness from gluteus maximus to bottom of foot. Sometimes pain is worse in gluteus maximus and sometimes worse in the bottom of the left foot…. He relates constant discomfort. Whole leg has burning pain. Inactivity makes the pain worse. He also has severe tightness at back of leg…. Character of the pain: burning, an electric shock (but sustained), sharp, stabbing, a deep ache.

*Id*. Dr. Laich agreed to perform an L5-S1 extra-pedicular decompression surgery. AR 1557.

18

On June 25, 2019, Snapper underwent the procedure. AR 1274-78. On July 12, 2019, Snapper met with Dr. Laich for a postoperative visit. AR 1539. According to Dr. Laich, Snapper "relate[d] improvement of his preoperative left gluteal and proximal hamstring cramping but continues with pain down his posterior thigh and leg to the bottom of his foot with prolonged ambulation." *Id*. Snapper reported that he was sleeping longer "due to less discomfort with laying down." *Id*. Although Snapper had "increased ambulation over the last week … [h]is numbness is unchanged." *Id*. In response to a question about "Patient Satisfaction," Snapper responded, "*I am the same or worse compared to before surgery (too soon to tell)*" (italics in original). *Id*. Dr. Laich referred Snapper for physical therapy. AR 1542.

On July 16, 2019, Snapper met with Megan Rao, a physical therapist at the Shirley Ryan AbilityLab. AR 1762. During the session, Snapper and Rao developed five goals, including "return to work as an attorney," and "return to swimming or pool exercise for CV [cardiovascular] benefit and pain reduction." AR 1766.

On July 26, 2019, Snapper met with Dr. Laich for another post-surgery visit. Snapper reported to Dr. Laich that "one symptom of buttock/lower extremity 'wrapped pressure' is gone, but left lower extremity burning radiation of pain continues and

19

increased after physical therapy/with physical therapy." AR 1544. Additionally, Dr. Laich's notes state, "'Percocet needed.' So frustrated. With ambulation notes sharp stab into planter foot." *Id*. Snapper again described the pain as "*burning, an electric shock, sharp, stabbing, a deep ache*." (italics in original). AR 1544.

At a post-surgery visit on August 29, 2019, Snapper reported continued pain in his left lower extremity. This appears to have been worsened by physical therapy at the AbilityLab. *See* AR 1611 ("Physical therapy at Shirley Ryan will flare up for two weeks, therefore requiring opioids again. States no sleeping over this period. This has helped, therefore sleeping and overall better."). Dr. Laich recommended an additional spinal surgery. He also referred Snapper to be fitted for a back brace. AR 1616.[10]

On October 8, 2019, Snapper underwent his third lumbar spine surgery, an L5-S1 discectomy and anterior lumbar interbody fusion ("ALIF"), performed by Dr. Laich. AR 1623-24.[11] Snapper

---

[10] The record is unclear as to whether Snapper was ever fitted for the brace.

[11] As explained by the American Academy of Orthopaedic Surgeons:

> Spinal fusion is a surgical procedure used to correct problems with the small bones in the spine (vertebrae). It is essentially a welding process. The basic idea is to fuse together the painful or unstable vertebrae so that they heal into a single, solid bone. An interbody fusion is a type of spinal fusion that involves removing the

met with Dr. Laich for a post-surgery visit on November 7, 2019.
Dr. Laich's notes from the visit state: "Joseph … continues with
severe posterior LLE pain but states that it is somewhat
different in that it 'feels fresh' but states the cramping and
numbness are less often. He relates the numbness improved
following his microdiscectomy and even more after his fusion.
The numbness will increase with increased activity." AR 1623. At
the follow up post-surgery visit on November 7, 2019, Dr. Laich
referred Snapper for "[a]quatic therapy, 1-2 times per week. AR
459.

On November 8, 2019, Snapper resumed physical therapy at
the Shirley Ryan AbilityLab. AR 1711. His Physical Therapist,
Nicholas Gornick reported: "Pt states that he feels slightly
worse since the surgery. He gets pain down the L LE to the
glut[eus] and he also has pain in the bottom of the foot." AR

---

intervertebral disk. When the disk space has been cleared
out, your surgeon will implant a metal, plastic, or bone
spacer between the two adjoining vertebrae…. After the cage
is placed in the disk space, the surgeon may add stability
to your spine by using metal screws, plates, and rods to
hold the cage in place…. An interbody fusion can be
performed using different approaches. For example, the
surgeon can access the spine through incisions in the lower
back or through incisions in the front of the body. In an
anterior lumbar interbody fusion (ALIF), the surgeon
approaches the lower back from the front through an
incision in the abdomen.

Am. Academy of Orthopaedic Surgeons, Anterior Lumbar Interbody Fusion,
https://orthoinfo.aaos.org/ en/treatment/anterior-lumbar-interbody-
fusion.

1711. Gornick and Snapper developed a number of goals for his therapy. AR 1714. One goal, for example, was for Snapper to "sit for 30 mins with no increase in low back pain." *Id*. Another was for him to "sleep at least 5 hours per night prior to waking up due to pain." *Id*. The therapy sessions were to take place once or twice per week for the ensuing five to six weeks. AR 1716.

On December 13, 2019, after nine sessions, Snapper was discharged from the program. AR 1720; Pl.'s PFF ¶ 46. Under "Reason for discharge," Gornick states: "Has not met goals, no change in pain." AR 1720. Snapper appears in fact to have met at least two of his goals: sleeping for at least five hours and becoming "independent with final home program." AR 1723. However, he did not meet the remaining three goals: sitting for 30 minutes with no increase in back pain (he was not able to sit for longer than 5 minutes); returning to light weight-lifting activities in the gym; and improving his score on the Lower Extremity Functional Scale (LEFS) by 15%. AR 1720-21. At that time, Gornick referred Snapper to the AbilityLab's Pain Management Center. AR 1720.

Snapper returned to Dr. Laich on January 9, 2020. According to Dr. Laich's notes, Snapper reported "continued relief of lower back pain since surgery, but left lower extremity pain continues radiating 'low-voltage' posterior thigh/foot (origin) with vertical activities. If flat in bed OK, as sit or stand

onset. Continues swimming." AR 1628. Dr. Laich increased
Snapper's gabapentin to 600 MG three times daily (apparently in
addition to his existing Percocet prescription, *see* Pl.'s PFF ¶
47), and noted that Snapper would be participating in the
AbilityLab pain management program. AR 1631.

On February 13, 2020, Snapper met with Dr. Laich for
another follow-up visit. According to Dr. Laich's notes, Snapper
stated:

> left lower extremity has improved, but still left
> lower extremity radiculopathy; what has improved
> clearly is now finally able to sleep. Now can at least
> wake, exercise for spine, swim flip turns cause
> instant heat and numbness into left lower extremity.
> He relates 10 pounds weight loss, he resigned his
> position/employment.

AR 1637. Snapper again described the pain as "*burning, an
electric shock, sharp, shooting, standing, a deep ache*," and
said his pain was "fairly severe." *Id.* (italics in original). At
the visit, Snapper rated his buttock/left leg pain at 7-8 out of
10. *Id.*

Snapper's next visit with Dr. Laich took place on May 21,
2020, and was conducted remotely due to COVID-19 protocols. AR
1805. Dr. Laich noted that COVID-19 had interfered with
Snapper's progress because the pool where Snapper swam had
closed and he could no longer engage in "muscle activation
therapy." *Id.* Dr. Laich's notes state that "since surgery
[Snapper] relayed dramatic improvement," but "nonetheless not to

point he is able to near fully participate in life." *Id*.

Similarly, "[s]ensation has improved as well, about which he is

encouraged; although again pointed out that it is not near

normal." *Id*. Snapper reported that he remains home most of the

time not only due to COVID but due to pain. *Id*.

On July 24, 2020, Snapper was examined by Dr. Laich in

person. Unum underscores that this appointment took place

roughly a week after it had notified Snapper that his LTD

benefits would be discontinued. *See, e.g.*, Def.'s PFF ¶ 34;

Def.'s Resp. Br. 8; Def.'s Reply Br. 7. Unum's termination of

Snapper's benefits is discussed in greater detail below.

According to Dr. Laich's notes, Snapper:

> relates that overall horizontal is noticeably better,
> and vertical (stand, sit, walk) is "worse." Entire
> left leg with numbness/tingling and overall "crescendo
> of pain" may be in upper leg/thigh. He relates that he
> is using Percocet to work out, 1-2 Percocet/day….
> Spent time on boat and fishing in Michigan. Now
> swimming 3-1/2 miles and on stairmill x20 minutes.
> Pain medications need to knock pain down. Relates not
> confident anything will help with left lower extremity
> pain…. "I am where I am."

AR 3630.

## F.  Shirley Ryan AbilityLab Pain Management Program: January 2020

On January 13, 2020, Snapper was evaluated for

participation in the Shirley Ryan AbilityLab's four-week

interdisciplinary chronic pain management program that Gornick

had recommended. AR 1652; AR 1674; Def.'s PFF ¶ 16. The program

24

incorporates "cognitive-behavioral techniques for managing chronic pain, stress management, emotion regulation, biofeedback assisted relaxation training, family education and counseling." AR 1378.

Snapper was first evaluated by Dr. Melissa Osborn, MD. According to notes from Dr. Osborn's examination, Snapper described his pain as encompassing his "'entire left leg' from the left buttocks to the left foot. Most severe on the posterior aspect including the left posterior thigh to the bottom of the left foot. Denies back pain." AR 1652. Snapper described the quality of the pain as "like grabbing an electric fence." *Id*. He estimated his pain on that day to be 6 out of 10, and stated that during the past week, his worst pain was 8.5 out of 10, and the slightest pain was between 2 and 3 out of 10. AR 1653. According to Dr. Osborn's notes, Snapper reported "confusion and memory difficulty, but these started before the meds. Later states that his confusion is worse after increasing gabapentin dose from 300mg TID to 600mg TID a few weeks ago. Pain is not improved on higher gabapentin dose." AR 1653. Additionally, Snapper stated that his "Meds are 'slightly' less effective than they used to be." *Id*. Under the heading "Mood," Dr. Osborn records Snapper as remarking, "'I'm still in shock' (regarding not working full-time and having pain affect him to this degree). When asked specifically about depression, anxiety, and

irritability related to his pain, he states 'yes to all.'" *Id*.
Dr. Osborn's notes further state: "Goes to pool daily, swims
1000–1500 yards, does nerve glides in pool. He reports that it
is difficult to get to the pool – requires walking two blocks
and up one flight of stairs he takes a couple breaks on his way
due to pain." *Id*. On the basis of the examination, Dr. Osborn
concluded that Snapper was "a good candidate to participate in
the Full Day Interdisciplinary Pain/Functional Restoration
program to address his LLE pain and sleep/mood abnormalities,
which are leading to inability to work and decreased mobility."
AR 1657. She also recommended talking to Dr. Laich about
decreasing his gabapentin dosage back down to 300 mg and
"weaning down on Percocet." *Id*.

Next, Snapper was examined by psychologist Dr. Sharon Song,
Ph.D. Dr. Song's psychological evaluation notes state that
Snapper reported "depression, diminished ability to concentrate
and remember due to his medications, and "increased crying (i.e.
when walking back home from pool tx due to the pain)." AR 918.
Snapper also "[r]eport[ed] a great deal of frustration with the
current situation, anger, and increased irritability." *Id*.
According to Dr. Song's notes:

> the patient reports that the pain has had a negative
> impact on his lifestyle and level of functioning; he
> no longer works, socializes (states he does not want
> his friends, many of whom are colleagues, to see him
> on painkillers, limping, and "sounding like an

26

idiot"), runs or works out rigorously, or attends to house chores.

*Id*.

Dr. Song's assessment states that Snapper "engaged in a number of pain behaviors during the hour long interview; he exhibited poor posture and sat and moved in a guarded fashion." AR 918. She further opined that "[p]ossible reinforcement for pain behaviors" were "STDI, channel for emotional distress, perceived justification for opioid medications." *Id*. Similarly, later in the assessment Dr. Song states that Snapper's "pain problem appears to be reinforced and maintained, at least in part, by financial disincentives. It appears to be affected by psycho-social factors that could be addressed with cognitive-behavioral interventions." AR 919. Additionally, Dr. Song reported that Snapper's level of pain acceptance was below average. *See* AR 918 ("[Snapper's] responses on the Chronic Pain Acceptance Questionnaire, a measure of pain acceptance, yielded a below-average score compared to a similar sample of chronic pain patients. Specifically, the patient's score on the Activity Engagement subscale, which measures the degree to which one engages in life activity despite pain, was below-average. The patient score on the Pain Willingness subscale which assesses the patient willingness to experience pain, was below-average.").

27

Dr. Song also stated that the "patient reports he is not using alcohol although may be using street drugs to help with pain, stress, and sleep. He reports he is not using prescribed medication inappropriately although seems to be struggling to ward off addiction based on the number of times he said he is afraid of opiates yet embraced them as his go-to strategy." AR 919. Finally, Dr. Song opined that Snapper had developed "some maladaptive coping strategies" but not others (e.g., Snapper had poor eating habits leading to a thirty-pound weight gain and engaged in "catastrophizing," but did not engage in "passive prayer"); and that Snapper lacked "some adaptive coping strategies" (e.g., Snapper did not use "distraction" or "cognitive-coping," but did use "distancing"). AR 918. Ultimately, Dr. Song concluded that Snapper was "open to a multi-disciplinary approach to pain management that would include psychological intervention. He appears to have reasonable rehabilitation goals and be motivated to learn chronic pain management techniques." AR 919

Snapper began the AbilityLab pain management program on January 20, 2020. On that day, he reported no back pain, stating once again that the location of his pain was his "'entire left leg' from the left buttocks to the left foot, most severe on the posterior aspect including the left posterior thigh to the bottom of the left foot." AR 1646. Snapper also reported being

28

in foul humor generally, stating, "'I am an asshole all the time' due to the pain." AR 1646.

Among other healthcare providers, Snapper was seen by physical therapist Sarah Kranz-Owens. AR 4296. Her notes list several goals to be achieved as a result of the therapy (e.g., "tolerate 60 minutes of sitting while effectively managing pain"; "tolerate 2 block walk while effectively managing pain"). AR 4298. The therapy was to be performed five to seven times per week for seven to eight weeks and would include aquatic therapy, balance training, gait training, group therapy, "mechanical modalities," neuromuscular reeducation, and pain management. AR 4299. In her assessment, Kranz-Owens stated that Snapper:

> is mildly receptive to learning about functional restoration and active pain management strategies – this date, however, P demonstrating high pain behaviors which is impacting his receptivity. Upon evaluation, P is stating he is unable to sit or stand during history taking. P presents with postural deviations significant for guarded and rigid trunk posture. P demonstrating MODERATE to SEVERE limitations active lumbar ROM [range of motion] with pain reported in all directions. P is able to tolerate supine and prone lying which decrease and centralize pain symptoms per patient report.

AR 4297 (capitalizations in original). Snapper also reported benefit from water therapy exercises. *Id.*

On the same day, Dr. Song wrote in her notes: "Therapeutic relationship building: the patient elaborated on his pain, contributing factors, and work situation to enhance his

[history] shared in the evaluation. He did disclose new secondary gain. Will need to monitor intrinsic motivation for tx." AR 926. She also remarked: "The patient was receptive to suggestions as well as to ongoing individual sessions," and "Patient appears to accept that the pain is chronic and the benefits of changing focus to self-management rather than medical management and cure. Patient is able to state realistic functional goals and appears to be motivated to learn and apply pain and stress management tools to meet those goals. Patient continues to have difficulty in managing pain and emotional distress." *Id.*

Jennifer Sarna, another of the AbilityLab's Licensed Clinical Psychologists, wrote: "Patient was an active participant in the group discussion and was observed to benefit from the information reviewed. asked appropriate questions and made comments that indicated understanding of the material. He said the class was helpful and was able to identify a number of functional goals." AR 928. She concluded: "Patient appears to accept the chronic nature of the pain problem and the need for self-management, but continues to have difficulty managing pain and stress." *Id.*

On the next day, January 21, 2020, Snapper left the program two hours early. AR 1644. Apparently, he did not speak with anyone at the program before leaving. Instead, he later sent a

30

message via the "patient portal" saying that he had been unable
to continue the program because of pain. *Id*. In her notes,
Psychologist Caryn Feldman stated that Snapper was "not
attentive and was called out twice for being on his cell phone,"
and that "when he did participate he was argumentative and
disrespectful," AR 3989. In addition, Dr. Feldman noted:
"Patient shows poor progress understanding concepts of
mindfulness meditation and how they relate to pain severity and
pain management. Patient may benefit from additional training to
foster independent practice of the technique, but he has poor
acceptance and motivation." *Id*.

On January 22, 2020, Snapper did not attend the program.
Later that day, Dr. Karina Bouffard, MD, the AbilityLab's pain
management physician, phoned Snapper. According to Dr. Bouffard,
Snapper explained that he had "tried to push through" during the
previous day's session, and that he had taken a lot of opioids
afterwards "to help with the pain and that he just could not
continue with the program." AR 1644. The AbilityLab's policy
required discharge of patients with two unexcused absences from
the program. Because his early departure on the previous day was
deemed an unexcused absence, Snapper was considered to have
self-discharged from the program. Dr. Bouffard noted that "even
if he continued with the program we would recommend discharge

due to noncompliance and poor buy in and commitment to the program." *Id.*

## G.  Snapper's Return to the Shirley Ryan AbilityLab for Physical Therapy in August 2020

On August 3, 2020, Snapper messaged Dr. Khan at Northwestern Medicine, asking if he might be available for telehealth visit in the coming days or weeks. AR 3638. Snapper explained: "Following my lumbar fusion in October I've had basically no change in the burning in the left leg, maybe a bit better when I'm horizontal, and maybe a bit worse when I'm vertical, but essentially the same condition as when you were treating me." *Id*.

Dr. Khan held a telehealth visit with Snapper on August 20, 2020. AR 1914. Snapper recounted the procedures he had undergone—the surgeries, epidural injections, the spinal cord stimulator, medications, and physical therapy—with no change in his pain, which he described as "burning, shooting pain that is constant in nature, located in his left low back, left buttock, with radiation into the hamstring into the calf and involving the entirety of his foot." *Id*. Snapper told Dr. Khan that he experienced "excessive sedation" with gabapentin but preferred gabapentin to Percocet because he preferred not to "be dependant (sic) on Percocet all day long." AR 1915. In addition, Snapper stated that he wanted to explore other treatment options. Dr.

32

Khan prescribed Lyrica for Snapper and suggested a follow-up in four weeks to discuss another stimulator trial. *Id.*

On August 24, 2020, Snapper returned to the Shirley Ryan AbilityLab for physical therapy, where he was examined once again by Dr. Chu. After reviewing Snapper's medical history, Dr. Chu ordered "a trial of PT for Lumbar spine mechanical diagnosis and treatment, lumbar stabilization and ROM, postural mechanics, trial nerve glides, consider Pool therapy, work on lower extremely stretching as well, develop home exercise program." AR 2213.

On September 10, 2020, Snapper underwent a physical therapy evaluation at the AbilityLab performed by physical therapist Kristen Wu. Under "Subjective Statement," Wu notes that Snapper "has tried several short bouts of PT, which typically involve repeated movements -- they have left him with the debilitating pain x 4 days at a time. As a result, he reports not following through with PT. [Snapper] reports he was about to cancel today's appointment because past PT has not been successful." AR 2198. Wu noted that Snapper used a stairmill for strengthening "20 minutes, every day after taking pain killers," and swimming every other day, though "does not kick due to pain." *Id.* As he had done with previous physical therapists, Snapper worked with Wu to develop goals for his therapy. AR 2202. However, on

September 17, 2020, Snapper cancelled the scheduled physical therapy session. AR 3683; Def.'s PFF ¶ 43.

## H. Snapper's Application for LTD Benefits and Unum's Handling of His Claim

Snapper applied for LTD benefits under the Plan on July 29, 2019, after satisfying the Plan's 180-day "elimination period," (the "period of continuous disability which must be satisfied before you are eligible to receive benefits"). AR 139; AR 178. He identified his medical condition as "lumbar radiculopathy/sciatica." AR 104. Unum initially granted the claim, paying Snapper benefits in the amount of $17,000.00 per month beginning on August 18, 2019.[12] After approving Snapper's claim, Unum continued periodically to seek updated information regarding his condition, corresponding with both Snapper and Dr. Laich. Unum faxed Dr. Laich a form on November 20, 2019, asking various questions relating to Snapper's condition. On December 3, 2019, Dr. Laich responded. His handwriting is difficult to decipher, but he appears to indicate that "with appropriate reconditioning" Snapper could return to work on a full- or part-time basis in a year. AR 608. On December 17, 2019, Dr. Laich seems to have resubmitted the form, this time with more legible

---

[12] The LTD Plan provided for payment of 60 percent of Snapper's monthly earnings. AR 225. Snapper's annual salary at the time was $340,000 and his monthly earnings were $28,333.33. AR 216.

writing. He stated that Snapper was "unable to lift greater than 10 pounds" and was "unable to twist/turn at waist," and "unable to walk, stand, sit for prolonged periods." AR 626. Dr. Laich went on to say that Snapper was in "the early post-operative healing phase," *id.*, that he had recommended weekly aquatic therapy for Snapper, and that he would "follow up in office at the 3 month post op mark," AR 628.

Unum also attempted to visit with Snapper in person. Eric Peischl ("Peischl"), a private investigator hired by Unum, initially attempted to contact Snapper by phone on December 4, 2019. AR 650. The next day, Snapper called back but Peischl was unable to take the call. *Id.* Peischl made several other attempts to contact Snapper by phone until December 27, 2019, when he attempted an unannounced visit at Snapper's home. AR 651. Peischl was met by the doorman to Snapper's building. *Id.*; Pl.'s PFF ¶ 70. The doorman contacted Snapper by phone, but according to Peischl's notes, the doorman informed him that Snapper had said that he was away from home for the holidays. AR 651. Later that day, Snapper phoned Unum. He stated that Peischl had lied to the doorman in an attempt to gain entry to the building and was "being extremely intrusive." AR 647. According to an Unum representative, Snapper stated that he would prefer to decline an in-person meeting if the matter were optional. *Id.* The representative said that she would check with a Disability

Benefits Specialist to determine whether the meeting was indeed optional. She attempted to transfer Snapper to a specialist but the call was disconnected. *Id.* According to Snapper, Unum never followed up with him regarding the need for an in-person interview. Pl.'s PFF ¶ 70.

On January 23, 2020, Snapper completed a "Disability Status Update" form from Unum. He reported: "I am largely confined to my residence, except for physical therapy and very occasional social outings. I can perform normal chores but with pain." AR 717.

During this period, an Unum vocational specialist determined that the "material and substantial duties of [Snapper's] occupation within the national economy most closely match[ed] the demands of Litigation Attorney." AR 1139. Using the Enhanced Dictionary of Occupational Titles (eDOT), Unum listed the duties of Snapper's occupation as follows:

> Sedentary Work:
> • Lifting, carrying, pushing, pulling 10 pounds occasionally,
> • Mostly sitting, may involve standing or walking for brief periods of time,
> • Frequent reaching, handling, fingering, keyboard use, and
> • Travel by automobile.

AR 1113.

On January 27, 2020, Unum wrote Dr. Laich asking for "clarification regarding Joseph Snapper's work capacity" with regard to the above-mentioned tasks. AR 746. Dr. Laich responded

that Snapper was not able to perform the tasks on a full-time basis. *Id*. Unum sent the form to Dr. Laich again, and on March 19, 2020, he responded by indicating that Snapper still was unable to perform the tasks full-time. AR 808.

On March 23, 2020, Snapper completed another Disability Status Update form. AR 835. He reported, "I pretty much stay at home, as walking remains very painful. I leave home for physical therapy. I can care for myself generally though it is painful." *Id*.

On June 23, 2020, Dr. Laich once again completed a form from Unum seeking clarification regarding Snapper's work capacity. Dr. Laich indicated that Snapper was not able to perform the occupational demands listed and wrote the following in the space provided for detailed medical restrictions and limitations:

> Due to COVID-19, Joseph has not completed his full medical rehabilitation. He is still with episodic pain limiting his work hours to ≤6 hours/day with breaks, lifting 5-7 lbs, sitting [with] breaks every 20 minutes, and travel by automobile restricted to 20 minutes. We recommend resuming rehab program and evaluating his MMI [maximum medical improvement] at his 1 year anniversary in October 2020. Further work capacity will be evaluated at this time.

AR 1113.

In July 2020, Snapper's medical records were reviewed by one of Unum's Designated Medical Officers (DMOs), Dr. Stephen Kirsch, MD, M.P.H., to determine whether, based on the available

medical information, Snapper was capable of performing the
Sedentary Work duties of his occupation as determined by Unum's
vocational specialist (e.g., Lifting, carrying, pushing, pulling
10 pounds occasionally; frequent reaching, handling, fingering,
keyboard use; travel by automobile). Dr. Kirsch, who is board
certified in family medicine, created an internal report dated
July 14, 2020, in which he concluded that "the medical record
fails to support that the claimant is currently precluded from
performing the physical demands of his occupation, as specified
by the vocational resource, on a full-time, sustained basis." AR
1126.

Dr. Kirsch outlined several bases for his determination.
First, he cited the fact that Snapper had reported improvement
in his symptoms. AR 1125. Specifically, Dr. Kirsch stated that
as of November 7, 2019, following his fusion surgery, Snapper
reported "less cramping and numbness"; as of February 13, 2020,
Snapper "reported left lower extremity symptoms have improved in
addition to his ability to sleep"; and as of May 21, 2020,
Snapper "endorsed left lower extremity pain and denied back
pain" and "reported improvement in sensation." *Id.*

Second, Dr. Kirsch cited "limited physical exam findings"
in support of his conclusion. Among other things, Kirsch stated
that "[f]ollowing his lumbar spine surgery in June 2019, the
claimant's motor function, reflexes, and sensation findings are

38

noted to be normal"; as of January 9, 2020, "the claimant was noted to have slight left toe raise weakness, otherwise examination was normal"; evaluations between July 16, 2019 and January 22, 2020 showed "[m]otor strength, reflexes, and cognition were normal"; and that as of February 13, 2020, Snapper "was noted to have a decreased lumbar range of motion, normal/antalgic gait, along with normal strength, sensation, and reflexes." AR 1125.

Third, Dr. Kirsch noted "[l]imited diagnostic test findings." Specifically, he commented that "[r]adiographs obtained on January 9, 2020 revealed hardware in good alignment with no abnormal motion noted." AR 1125. Fourth, Dr. Kirsch cited "limited treatment intensity," observing that Snapper's Percocet dosage had been reduced from two tablets in January 2020 to one as of May 2020. AR 1125-26. As a final basis for his opinion, Dr. Kirsch cited Snapper's reported activities. Among other things, he observed that as of January 9, 2020, Snapper reported swimming for exercise, and that Snapper reported being able to travel "but it does cause increased pain." AR 1126. Dr. Kirsch also pointed to Snapper's January 23, 2020, disability status update, in which Snapper "reported the ability to 'perform normal chores, but with pain.'" *Id.* Dr. Kirsch stated that at Snapper's February 13, 2020, appointment with Dr. Laich,

Snapper "reported the ability to lift heavy weights 'but it is painful.'" *Id*.

In short, Dr. Kirsch concluded, "[t]he claimant's reported activities, as documented in progress notes, are in excess of his occupational demands. Given his uncomplicated recovery from his fusion surgery along with normal physical exam and stable radiographic findings, the restrictions on performing sedentary work and lifting greater than 7 pounds, would not be supported." AR 1126.

In an internal report dated July 16, 2020, Dr. Jamie Lewis, a physician board certified in physical medicine and rehabilitation and pain medicine, reviewed Dr. Kirsch's opinion and agreed that the "existence, intensity, frequency, and duration of the claimant's reported symptoms including but not limited to pain, numbness/tingling/weakness, difficulty reading, writing, or concentrating, are not consistent with physical exam findings, diagnostic test findings and treatment intensity. AR 1130. Dr. Lewis reviewed the medical notes, exams, and other information in Snapper's case and concluded: "There are no severe findings on imaging such as nerve root compression or fracture. Examination findings of lower extremity weakness, decreased range of motion, and an antalgic gait would not preclude the claimant from the job duties described above. Therefore, functional impairment is not supported from a

physical medicine/rehabilitation and pain medicine perspective." AR 1132.

On July 17, 2020, Katie Ayer, an Unum Disability Benefits Specialist, incorporated these opinions into a letter informing Snapper that Unum had determined that he was able to perform the duties of his occupation and that he was therefore no longer considered to be disabled within the meaning of the Plan. The letter informed Snapper that his LTD benefits would be terminated as of that date. AR 1138.

**I. Snapper's Appeal**

On December 4, 2020, Snapper appealed Unum's termination of his benefits. *See* AR 1245-62. In addition to disputing the opinions of Unum's physicians, Snapper's counsel pointed out in a lengthy letter that Unum had improperly defined the material duties of Snapper's occupation. Specifically, Snapper's counsel noted that Unum had failed to follow the Plan's terms, which required Unum to look to the material and substantial duties that Snapper was actually performing prior to his disability, instead of consulting abstract definitions or looking to how his occupation is performed in the national economy. AR 1259.

Snapper's counsel also submitted an attorney job description provided by Mayer Brown. Among other duties, Mayer Brown's job description states that all of the firm's partners and associates must be able to:

41

Perform and/or understand technical legal research issues and analysis

Review and analyze complex and sophisticated facts, issues, risks, and documents

Confer with colleagues about research findings or analysis and communicate findings or analysis effectively

Draft clear, cogent and well-structured written materials, including but not limited to, emails, correspondence, legal memoranda, and transaction documents

Handle oral presentations effectively and professionally within the Firm

Handle oral presentations effectively and professionally outside the Firm, e.g., before clients, experts, witnesses, judges, juries, arbitrators, investigators, and government agencies and/or their representatives

….

Effectively manage time, including making time and/or travel commitments and/or sacrifices necessary to satisfy client demands and meet deadlines

Handle the demands of a high volume of work and be able to prioritize multiple assignments

Sit at a computer and type for extended hours

Read voluminous amounts of records both on-line and in hard copy

Satisfy designated competencies for the appropriate level of practice in the designated practice area

AR 37-38.

Additionally, Snapper also submitted a Physical Work

Performance Evaluation ("PWPE"), a three-hour Functional

Capacity Evaluation (FCE) performed on September 16, 2020, by Angela Pennisi ("Pennisi"), a board certified Clinical Specialist in Orthopedic Physical Therapy. AR 3672-82. Pennisi observed Snapper while he performed a variety of activities, including pushing, pulling, standing, sitting, crawling, carrying, and lifting. She assessed the extent to which Snapper was able to perform the various tasks, using the categories "Never," "Occasionally," "Frequently," and "Constantly." AR 3675. After completing the evaluation, she offered the following conclusions:

1. Mr. Snapper is incapable of performing his current work of Attorney. His employer's job description for the job of Attorney includes "sit at a computer and type for extended hours" and "Handle oral presentations [performed in standing]", which he is unable to perform. His limitations would similarly preclude him from being able to "Attend and complete necessary CLE coursework" and "…engaging in speaking opportunities."

2. Mr. Snapper is able to perform the materials handling requirements of Sedentary work, which was limited to 10 pounds. Mr. Snapper is able to lift a maximum of 29 pounds Occasionally.

3. However, he is unable to perform Sedentary work for the 8-hour day, 40 hours per week due to his ability to Sit, Stand or Walk for work Never, which is less than 1/3 of the workday.

4. Mr. Snapper demonstrated declining performance over time, primarily related to the cumulative effects of weightbearing and maintaining positions against gravity.

> 5. Mr. Snapper contacted me on the two days following
> the evaluation to report requiring twice the normal
> dosage of Percocet after the evaluation to manage
> his symptoms. He reported the nausea that began near
> the end of the evaluation had persisted for more
> than 24 hours. He reported continued limitations in
> his function, stating he could only take small
> shuffling steps due to radicular symptoms and
> feeling of weakness. He deferred a planned errand to
> the pharmacy due to these symptoms. On September 18,
> 2020, he reported slight improvement, but continued
> exacerbation of symptoms and continued impaired gait
> and nausea.

AR 3676-77.

On January 28, 2021, Snapper met with Keith Moglowsky ("Moglowsky"), a vocational consultant. In addition to interviewing Snapper, Moglowsky reviewed Pennisi's PWPE, the reports of Unum's vocational consultants, as well as the Mayer Brown attorney job description, and portions of Unum's LTD Plan defining Snapper's occupation. AR 4511-20. Moglowsky issued a report on February 11, 2021, regarding the duties of Snapper's occupation and his ability to perform them. He opined:

> Despite Mr. Snapper having had a successful
> career as a Lawyer/Litigation Attorney, it is my
> opinion that disability related issues have
> negated his ability to perform material and
> substantial duties he was performing just prior
> to disability, as well as his regular occupation
> as it is normally seen in his local economy.
>
> Mr. Snapper's job requires at least Light
> physical demand work, with possibly some in the
> Medium category when performing his job duties.
> Based on the results of the [PWPE], he is capable
> of sub-Sedentary capacity work. Even if he was

> able to engage in full-time occupational
> activities at a Sedentary level, this exceeds his
> physical capabilities.
>
> Therefore, it is my opinion that Mr. Snapper
> meets disability definitions under the policy
> language as previously stated.

AR 4518.

Lastly, Snapper submitted declarations from a number of his friends and acquaintances, offering their observations about his condition and how his pain had affected him.[13]

Snapper's appeal was reviewed by Dr. Scott Norris, MD, MPH, a physician board certified in family medicine and occupational medicine. Dr. Norris reviewed the record, including new evidence submitted in connection with the appeal, and opined on two questions: (1) "Are the reported existence, severity, duration and frequency of the reported signs and symptoms consistent with the underlying injuries/illnesses and other documentation in the file?"; and (2) "Does the available medical evidence support the EE is limited from lifting, carrying, pushing, and pulling up to 10 pounds occasionally, mostly sitting with occasional standing

---

[13] The declarations are unsworn but were executed under penalty of perjury pursuant to 28 U.S.C. § 1746. Thus, while not technically affidavits, declarations under § 1746 are "equivalent to an affidavit for purposes of summary judgment." *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011). There is no case authority discussing addressing the admissibility of declarations under § 1746 for purposes of Rule 52 motions. It is unnecessary to address that question, however, because Unum raises no objection to the declarations' admissibility. Indeed, with the exception of Snapper's request for judicial notice, neither party has raised any evidentiary objections in the case.

and walking for brief periods, reaching, handling, fingering, and keyboarding frequently, and travel by car beyond" July 17, 2020. AR 4442. Dr. Norris answered both questions in the negative.

With respect to the first question, Dr. Norris explained that, despite Snapper's reports of pain, "examination findings were inconsistent, and findings on postoperative imaging did not identify evidence of moderate or severe neuroforaminal/central canal stenosis commensurate with the degree of impairment reported by the EE [Eligible Employee]." AR 4442. Dr. Norris acknowledged that "[p]ersistent left lower extremity sensory loss in the S1 distribution is generally noted and c/w his longstanding [history] of lumbar DDD [degenerative disc disease]," but stated that "exams described highly variable sensory findings, ranging from normal to diffuse, non-anatomic deficits, and motor deficit patterns that were not consistent between providers are not consistent with radiographic and electrodiagnostic findings." *Id*.

Additionally, Dr. Norris cited Snapper's "self-discontinued" participation in the AbilityLab pain management program. *See* AR 4442. Dr. Norris incorrectly states that Snapper stopped participating due to COVID restrictions, not to pain, and appears to draw an unfavorable inference from this "fact," noting that Snapper resumed appointments with his other doctors.

*Id.* ("Records indicate that the insured self-discontinued participation in a comprehensive Pain Medicine program, citing COVID restrictions. However, records do not indicate that the EE attempted resumption of the comprehensive program at a later time. Given that EE resumed other medical appointments in Aug/Sep 2020, it would be expected that he would have resumed the Pain Medicine program (started Jan 2020), since his initial participation was very brief.").

Dr. Norris further opined that Snapper's "reported activities (regular swimming, exercise, stair mill, driving, grocery shopping, regular household tasks, etc.) were not c/w the severe level of impairment reported," and that Snapper's "report of being largely confined to his residence was inconsistent with his regular pool exercise program and his travel away during the holidays." AR 4442. He concluded, "the insured's reported level of severe impairment related to his lumbar condition was not c/w the limited and inconsistent examination findings, the modest postoperative imaging findings, the sporadic and inconsistent level of treatment from Jan 2019 through the Jul 2020 claim closure, and the insured activity level." *Id.*

As to the second question—whether the medical evidence supported the conclusion that Snapper was subject to the limitations on sedentary work—Dr. Norris opined that Snapper

would have "the option to shift posture as needed and the option to change positions (e.g. sit to stand) for brief periods intermittently during the workday." AR 4442. While again acknowledging Snapper's reports of pain, Dr. Norris stated, "examination findings were limited, variable, and not consistent with the severe level of impairment as reported by the EE, or with a degree of functional compromise that would preclude sedentary level activity." *Id*. In addition, Dr. Norris explained, "Diagnostic testing/imaging following the insured's Oct 2019 lumbar surgery did not identify structural compromise or other pathological conditions c/w the severity of functional loss as reported by the EE impairment well with other indicators of impairment that would preclude sedentary level activity." *Id*. He said "The variable, and at times, non-anatomic pattern of sensory and motor deficits noted on exams were not consistent with the mild findings on imaging studies in Feb 2020." *Id*.

Additionally, like Dr. Kirsch, Dr. Norris opined that Snapper's treatment after February 2020 "remained conservative and generally stable." AR 4442. In particular, he stated that there was little attempt to adjust Snapper's medications. *See id*. ("Records indicate that the insured required only minimal amounts of narcotic medication for prn use, and there was no evidence of an escalating use pattern. The insured reported sedation related to gabapentin after the claim closed and failed

a trial of Lyrica. However, there were no subsequent attempts to modify dosing or try alternative agents; such actions would have been expected if there were ongoing clinical or functional concern regarding impairing gabapentin side effects.").

Finally, Dr. Norris again opined that Snapper's reported level of activity was consistent with having the capacity to perform sedentary activity. AR 4442. He discussed what he took to be the shortcomings of the PWPE, remarking that the evaluation's findings were inconsistent with recent physical examinations and with Dr. Laich's most recent in-person exam (which he said was 2/13/20). *Id*. Further, Dr. Norris opined that "the [PWPE] report noted some finding suggestive of submaximal and inconsistent effort" and noted what he regarded as an inconsistency in the PWPE's findings between the activities of climbing stairs and walking, and between floor-to-waist lifting compared to pushing and pulling. *Id*.

In a letter dated March 23, 2021, Unum upheld its termination of Snapper's benefits, providing an explanation for the basis for its decision. AR 4553-64.

## CONCLUSIONS OF LAW

**A.   Jurisdiction**

This suit arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. (ERISA) and asserts a claim for employee benefits under ERISA §502(a)(1)(B),

49

29 U.S.C. § 1132(a)(1)(B). As all agree, the Long-Term
Disability Plan at issue is governed by ERISA. *See Ed Miniat,
Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 738 (7th Cir.
1986) ("A welfare plan [under ERISA] requires five elements: (1)
a plan, fund or program, (2) established or maintained, (3) by
an employer or by an employee organization, or by both, (4) for
the purpose of providing medical, surgical, hospital care,
sickness, accident, disability, death, unemployment or vacation
benefits … (5) to participants or their beneficiaries."); AR
136; Pl.'s Br. 2; Def.'s Br. 1; Ans. ¶ 2.

I have jurisdiction over this suit by virtue of 29 U.S.C. §
1132(e)(1) and 28 U.S.C § 1331. Venue is proper in this district
pursuant to 29 U.S.C. § 1132(e)(2).

B. **Standard of Review**

"The Supreme Court directs that 'a denial of benefits
challenged under § 1132(a)(1)(B) is to be reviewed under a de
novo standard unless the benefit plan gives the administrator or
fiduciary discretionary authority to determine eligibility for
benefits or to construe the terms of the plan,' in which case a
deferential standard of review is appropriate." *Schultz v.
Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 836-37
(7th Cir. 2012) (quoting *Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101, 115 (1989)). "If such discretion is granted, court
review is under the arbitrary and capricious standard." *Id.*

50

Here, it is undisputed that the Plan contains no discretionary language. Pl.'s Br. 10; Def.'s PFF ¶ 8. Accordingly, my review of the dispute is de novo. Pl.'s Br. 10; Def.'s Resp. 11.

As the Seventh Circuit has observed, however, the expression "de novo review" in this context is potentially misleading, since the court does not actually "review" the underlying decision of the plan administrator:

> [I]n these cases the district courts are not *reviewing* anything; they are making an independent decision about the employee's entitlement to benefits. In the administrative arena, the court normally will be required to defer to the agency's findings of fact; when de novo consideration is appropriate in an ERISA case, in contrast, the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is irrelevant.

*Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (emphasis in original).

Hence, the question before me is not whether Unum gave Snapper "a full and fair hearing or undertook a selective review of the evidence." *Id*. Rather, I must decide the ultimate question of whether Snapper is entitled to the benefits he seeks under the Plan. *Id*. It is Snapper's burden to show by a preponderance of the evidence that he is entitled to benefits under the Plan. *See, e.g.*, *Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 865-66 (N.D. Ill. 2015) ("Plaintiff bears the burden of proving that he is entitled to benefits under the …

LTD Policy by a preponderance of the evidence.") (citing *Ruttenberg v. United States Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005)).

## C. Disability

As noted above, the Plan provides that an employee is "disabled" when he is "unable to perform the material and substantial duties of his or her regular occupation." AR 151. "[M]aterial and substantial duties" are those that "are normally required for the performance of your regular occupation," and those that "cannot be reasonably omitted or modified." AR 226. Thus, to determine whether Snapper is disabled, it is first necessary to determine the material and substantial duties of his occupation, and then to determine whether he is able to perform those duties. I discuss these questions below.

### 1. Snapper's Regular Occupation and Its Material and Substantial Duties

The Plan states that, "[f]or attorneys, 'regular occupation' means the material and substantial duties that you are performing just prior to disability." AR 181. As previously noted, Unum failed to adhere to this instruction. Instead, it relied on the Enhanced Dictionary of Occupational Titles' (eDOT's)[14] definition of "Litigation Attorney," which states:

---

[14] The eDOT is published by the Economic Research Institute and is distinct from the Department of Labor's Dictionary of Occupational

Sedentary Work:

- Lifting, Carrying, Pushing, Pulling 10 pounds occasionally,
- Mostly sitting, may involve standing or walking for brief periods of time,
- Frequent reaching, handling, fingering, keyboard use, and
- Travel by automobile.

AR 1139.

Snapper does not dispute that the tasks listed under the "Frequently" heading—such as reaching, handling, fingering, and keyboard use—are material and substantial duties of his occupation. Likewise, the parties agree that sitting, standing, and walking are material and substantial duties of his occupation. The parties dispute whether the additional physical tasks of traveling by air and carrying luggage and boxes are among the material and substantial duties of Snapper's occupation. As Unum points out, Mayer Brown afforded Snapper an accommodation in early 2018 that allowed him to discontinue traveling by air. Def.'s Resp. Br. 22 (citing AR 4514). Snapper characterizes this accommodation as "unsustainable" over the long term, *see* Pl.'s Resp. Br. 18, but he points to no evidence in support of that view. Accordingly, I conclude that air travel is not among Snapper's material and substantial duties. Snapper does, however, offer uncontroverted evidence that he was

---

Titles. *See, e.g.*, *Fetter v. United of Omaha Life Ins. Co.*, No. 20-C-0633, 2021 WL 1842463, at *6 (E.D. Wis. May 7, 2021).

required to carry luggage and boxes just prior to his disability, *see* AR 4517-18, so I include those duties within the definition of his occupation.

In addition, Snapper argues that his regular occupation includes all of the duties listed in Mayer Brown's job description, including, *inter alia*, the ability to: "Perform and/or understand technical legal research issues and analysis"; "Review and analyze complex and sophisticated facts, issues, risks, and documents"; "Draft clear, cogent and well-structured written materials, including but not limited to, emails, correspondence, legal memoranda, and transaction documents"; "Handle oral presentations effectively and professionally outside the Firm, e.g., before clients, experts, witnesses, judges, juries, arbitrators, investigators, and government agencies and/or their representatives"; "Effectively manage time, including making time and/or travel commitments and/or sacrifices necessary to satisfy client demands and meet deadlines"; "Sit at a computer and type for extended hours"; and "Read voluminous amounts of records both on-line and in hard copy." AR 37-38.

Unum offers no argument against the inclusion of these duties (which for simplicity I will refer to as "cognitive tasks") in the definition of Snapper's occupation. Accordingly, I conclude that, in addition to the physical tasks of sitting,

standing, walking, carrying, and lifting, the material and substantial duties of Snapper's occupation include the above-listed cognitive tasks reflected on Mayer Brown's job description.

## 2. Snapper's Ability to Perform the Material and Substantial Duties of His Occupation

I turn now to the question of whether Snapper is able to perform these duties. I begin with the cognitive tasks and then turn to the physical duties listed in Unum's definition.

### a. Cognitive tasks

Unum devotes virtually no attention to the evidence pertaining to Snapper's inability *vel non* to perform the cognitive aspects of his occupation. The issue was not discussed in any meaningful way by any of Unum's reviewing physicians. Unum simply asserts that the burden of proof is Snapper's and that he has failed to adduce any evidence of his cognitive impairment.

There is, however, ample evidence in the record supporting the conclusion that Snapper's pain prevented him from performing the cognitive functions listed in Mayer Brown's job description. Indeed, in the LTD claim form he submitted to Unum on July 29, 2019, Snapper responded to the question, "What specific duties of your occupation are you unable to perform due to your medical condition?" by stating: "All duties. Cannot sit, stand, walk,

read, write or concentrate because of constant pain." AR 105.

Snapper also reported to many of the surgeons, physicians,

psychologists, and physical therapists who examined him that he

had difficulties concentrating, focusing, and remembering. For

example, Dr. Song's notes from Snapper's January 13, 2020,

intake interview at the AbilityLab pain management program

state:

> in late 2016 or early 2017, [Snapper] experienced a
> pain that he describes as a burning, tight, sharp
> sensation. He states it broke his concentration at
> work and caused him to have to shift from written
> responsibilities to depositions and hearings. He
> reports developing memory impairments on the job due
> to the pain (was at a hearing and "couldn't remember a
> damn thing").

AR 1699; *see also* AR 918 (Dr. Song's notes dated January 13,

2020 stating that Snapper related "diminished ability to

concentrate and remember (states medications cause him confusion

and he had a hard time completing some of the intake forms)").

Similar notations can be found in Dr. Laich's notes, *see, e.g.*,

AR 1555 (notes dated May 23, 2019 reporting that Snapper

admitted to having "memory loss/problems"); Dr. Chu's notes,

*see*, *e.g.*, AR 999 (notes dated 6/15/18 stating that Snapper's

"Pain is described as achy, burning, cramping, stiff, tingling,

numbness, dull, tightness, pulling…. [Snapper] reports that it

is affecting his sleep, concentration, mood. He has had to stop

working since April 2018 because of this"); Dr. Osborn's notes,

*see, e.g.*, AR 1652 (notes dated 1/13/2020 stating that Snapper "Reports confusion and memory difficulty"); AR 1654 (notes dated 1/13/20 listing "Memory loss, Difficulty concentrating" under the heading "Review of Neurologic Systems"); Dr. Bouffard's notes, *see, e.g.*, AR 865 (notes dated 1/13/2020 recommending that Snapper talk to Dr. Laich about decreasing his gabapentin dosage "due to lack of pain relief and worse concentration on higher dose"); *see also* AR 888 (PT Kranz-Owens notes dated 1/20/20 that "Pain Negatively Impacts … Activity of Daily Living, Appetite, Concentration); AR 890 (PT Kranz-Owens notes dated 1/20/20 identifying "Difficulty concentrating, Pain" under "Barriers to Learning"); AR 893 (OT Alison Yum's notes dated 1/20/20 stating that Snapper "[r]eported grocery shopping trip this past Saturday, but usually orders grocery delivery services. States medications makes it's (sic) distracting and can get confused and can't remember what he was doing sometimes"); AR 896 (OT Yum's notes dated 11/8/19 stating "Pain Negatively Impacts … Concentration, Emotions, … Sleep, Work").

In addition, the record shows that the cognitive difficulties resulting directly from Snapper's pain were exacerbated by the prescription pain medications he took to control the pain. *See, e.g.*, AR 346 (Dr. Khan notes dated May 2018 stating that Snapper's gabapentin prescription would be discontinued due to "cognitive side effects" and substituting

57

Cymbalta instead); AR 339 (Dr. Khan notes dated June 2018 observing that "cymbalta made [Snapper] nauseous and 'foggy' so he stopped taking it"); AR 918 (Dr. Song notes dated 1/13/20 reporting that in "October 2019, [Snapper] had a spinal fusion. He reports 'his leg hurts all the time, he is sleep deprived, and pain medications have made him confused'"); AR 321 (Dr. Khan notes dated 12/6/2018 stating "Patient does not want to attempt medications as they make him 'foggy'"); AR 1647 (Dr. Bouffard notes dated 1/20/20 stating that Snapper "[p]reviously failed gabapentin due to fogginess"); AR 314 (Dr. Jason Michaels notes dated 2/21/19 reporting that Snapper "does not take Percocet during the day because it makes him unable to work").

Further evidence of that Snapper experienced cognitive difficulties as a result of his pain can be seen in declarations submitted by his friends and colleagues. For example, Peter Eli Johnson ("Johnson"), a friend of Snapper's for twelve years, states:

> Joe's previous baseline in terms of acuity, memory, and focus has downshifted over the last few years. He does not track complicated topics as well as he used to: our conversations are not as wide ranging, and I find that it is necessary to remind him of previous conversations. Previously, we've recommended books to each other on various topics - specifically politics, history, and wilderness conservation. He admitted to me recently that he finds himself unable to focus enough to read very much at all. I remember a meal when he was dazed from pain to the point that he had a hard time focusing on our conversation. At one point,

he was having such difficulty he excused himself to
stand outside of the restaurant.

AR 2377.

Similarly, a declaration submitted by Snapper's fishing

guide, Stephen Pels ("Pels"), observed:

> [O]ver time, I could tell Joe's mental capacity seemed
> impacted in mood, concentration and short-term memory.
> For example, when I first met him he would be able to
> hold conversations and fish at the same time, but as
> time passed, and he appeared to be in more pain, he
> would either fish or chat with me, not both…. During
> our phone conversations, I have noticed Joe's short-
> term memory suffer, frustration mount and his mood
> occasionally drop. Joe regularly becomes unclear as to
> topics we covered the prior day, stories we have told
> each other or has difficulty remembering future plans
> that we have made.

AR 2381.

Along with this, Marjan Batchelor ("Batchelor"), a friend

of Snapper's and a fellow Mayer Brown attorney, stated in her

declaration that in June or July 2019, Snapper's "condition

seemed to be getting much worse—his mobility was much more

limited than it had previously been, it was very difficult for

him to sit down and stand up, and he had a hard time tracking

and remembering conversations because he was so distracted by

pain." AR 1367.

Unum makes no attempt to dispute Snapper's cognitive

impairments or his inability to perform the tasks in Mayer

Brown's attorney job description. Accordingly, I conclude that

Snapper has carried his burden of showing that his pain (and the

medication used to treat it) prevented him from adequately performing material and substantial cognitive tasks.

### b. Physical tasks

Snapper's evidence regarding his inability to perform his physical duties is based to a significant extent on Pennisi's PWPE. Based on her examination, she opined that Snapper could lift, push, pull, and carry "Occasionally," but that he could "Never" sit, stand, or walk. AR 3675.

As Unum points out, however, Pennisi disclosed in her report that a mistake occurred during the testing. She explains that one of the key aspects of her testing methodology is to ensure that individuals do not engage in "self-limiting" during the test but instead made a full effort. This is accomplished by having the testing subject wear a fingertip heart rate monitor. In Snapper's case, it turned out that "after completion of approximately 75% of the tasks, [Pennisi] became aware that Mr. Snapper was incorrectly reporting his oxygen saturation instead of heart rate after appropriate tasks." AR 3674. Pennisi adds that once Snapper "was re-instructed in reading the monitor, his highest recorded heart rate was 98 bpm during the repeated squatting task." *Id*. According to Pennisi, the mistake did not vitiate the evaluation's results. As she explains, "[w]hen considering that [Snapper's] resting heart rate prior to beginning the evaluation was 75 bpm, this error did not impact

the overall level of work since the heart rate variance from the beginning to end of the evaluation was unlikely to have been greater than 25%." *Id*. Without further explanation—regarding, for example, the relationship between heart rate and oxygen saturation levels—I am not entirely convinced of the evaluation's reliability.

Snapper attempts to address the issue in his Response Brief by asserting that Unum "does not cite to any evidence supporting its current position that the PWPE was invalid." Pl.'s Resp. Br. 10. But, particularly in light of Pennisi's admission, the burden is on Snapper to demonstrate the test's validity, not on Unum to demonstrate the opposite. Snapper also argues that Unum failed to raise this objection sooner. He notes that although Dr. Norris raised problems with the assessment, neither he nor any of Unum's other DMOs raised concern about the heart rate monitor. Snapper goes on to assert that Unum should have either disclosed the issue sooner or performed its own functional capacity evaluation, and contends that Unum's failure to do so amounts to a breach of fiduciary duty. *Id*. at 11 (citing *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 809 (10th Cir. 2004) for the proposition that "[f]iduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence

in the record to refute that theory"). This argument, at least as it is adumbrated in his Response Brief, is not plausible. Hence, for the reasons discussed above, I decline to rely on Pennisi's PWPE in determining Snapper's ability to perform the physical tasks required by his occupation.

Nevertheless, there is substantial evidence in the record demonstrating Snapper's inability to perform the tasks of sitting, standing, and walking to the degree demanded by his work as an attorney. With respect to sitting, for instance, Snapper reported to Dr. Laich on several occasions that pain prevented him from sitting for more than ten minutes at a time. *See, e.g.*, 1328 (5/3/19 appointment); AR 1297 (1/9/2020 appointment). In addition, physical therapist Sarah Kranz-Owens reported that, at one point during the AbilityLab pain management program, Snapper verbalized "high pain," saying "I need to lie down" and that "he is not certain he will be able to make it through the day/program like this" because it involved "too much sitting." AR 887. That Snapper struggled with even modest amounts of sitting is illustrated by the fact that one of his physical therapy goals was to sit for thirty minutes with no increase in low back pain. AR 933. According to Moglowsky report, Snapper stated that his inability to sit without pain caused problems when he appeared in court or for depositions. *See* AR 4511 ("While in court, [Snapper] would have to change

62

positions frequently and would 'fidget,' which was distracting
to judges, opposing counsel, and others. He notes having had
issues with clients and/or colleagues being concerned if he was
able to perform his job effectively, exercise good judgment, and
focus accordingly. This was the same with depositions.").
Snapper's difficulty sitting is corroborated by Peter Johnson,
who recounts in his declaration: "I have observed a drastic and
steady decrease in Joe's physical fitness and mobility
especially in the last four years. Actions (sitting, standing,
walking), are accompanied with clear signs of pain. He grimaces
when moving from sitting to standing. These actions are slow and
not fluid. I've observed him unable to easily sit still for even
30 minutes: he shifts continuously." AR 1369.

The record similarly includes substantial evidence
demonstrating Snapper's inability to walk for any significant
distance. For example, during his intake interview for the
AbilityLab pain management program, Snapper reported to Dr.
Osborn that when he went swimming, he had to walk two blocks to
reach the pool, and that he needed to "take[] a couple of breaks
on his way due to pain." AR 3942; *see also* AR 893 (OT Alison Yum
notes dated 1/20/20 stating that Snapper "Reports walking makes
everything worse - even walking from front door to elevator and
the tour this morning flared his pain. If he doesn't walk, then
can sit for max 10 minutes"). As in the case of sitting,

Snapper's physical therapy goals further indicate the severity of his difficulty walking due to pain. One of his goals was merely to "tolerate 2 block walk while effectively managing pain." AR 4298. And once more, Peter Johnson's declaration recounts the following incident:

> That day, after our meal he was very challenged even to walk; it was slow, labored, and his steps were uneven and lurching. I walked with him back to his home. It took over 30 minutes to walk approximately three blocks. We stopped multiple times to allow him to rest. He was clearly in intense, disorienting pain.

AR 1369.

Snapper's difficulty standing is likewise thoroughly supported by the record. *See, e.g.*, AR 125 (Dr. Laich notes dated 7/12/19, indicating Snapper's report that pain prevented him from standing for more than ten minutes); AR 251 (Dr. Laich notes dated 7/26/19, same); AR 4482 (Dr. Laich notes dated 12/18/20 reporting that Snapper "still finds standing and ambulation to precipitate severe left LE radiculopathy"); AR 871 (Dr. Osborn notes dated 1/13/20 stating that Snapper has not noticed an improvement in pain with walking or standing following his fusion surgery); AR 4297 (PT Kranz-Owens notes dated 1/20/20 indicating Snapper reporting that he was unable to sit or stand while she took his medical history); AR 4414 (PT Joel Faudaun notes dated 6/27/18 recording sitting and standing as factors still aggravating Snapper's pain).

Lastly, in addition to the foregoing, I note that Dr. Laich concurred with the conclusions stated by Pennisi in the PWPE. Specifically, Dr. Laich remarked in his progress notes from a December 12, 2020, video appointment with Snapper:

> I appreciate 09/16/2020 Physical Work Performance Examination by Angela W Pennisi PT, MS in which she concludes: "Mr. Snapper is incapable of performing his current work of Attorney." Having seen, operated, and followed Joseph I continue to agree with her conclusion. He should continue his spine associated work as able with hopes he will progress, but should follow restrictions outlined in evaluation. His physical efforts must be used to continue to fight his condition.

AR 4482. As the statement makes clear, Dr. Laich endorses not only Pennisi's bottom-line conclusion that Snapper is unable to perform the physical duties required of his occupation as an attorney, but also her specific restrictions regarding, for example, lifting a maximum of twenty-nine pounds only occasionally, and not standing, sitting, or walking for more than a third of an eight-hour workday. *See* AR 3676. Dr. Laich also makes clear that his endorsement is based on his own observations and experience treating Snapper. He thus provides an independent source of support for the PWPE's findings, unaffected by any flaws in the way the evaluation was conducted.

In light of the foregoing, I conclude that Snapper has shown that he is unable to perform at least some of the basic

physical duties — sitting, standing, and walking — that his occupation requires.[15]

### c.  Summary of Snapper's Evidence

In sum, Snapper has a history of severe lower back and left leg pain that goes back to 2008. He has described the quality and severity of the pain (a sharp, shooting, burning pain similar to a sustained electric shock) with remarkable consistency over time. Snapper has been examined by numerous doctors and surgeons, all of whom arrived at a diagnosis or clinical impression of radiculopathy or a similar condition (e.g., radiculitis, Failed Back Syndrome).[16] Notably, these diagnoses remained constant both before and after Snapper's surgeries, and before and after his LTD benefits were denied. *Compare* AR 1589 (Dr. Khan, June 21, 2018, Radiculopathy, Lumbar

---

[15] I note that even if the evidence showed that Snapper were able to perform all of the physical tasks required by his occupation, the conclusion that he is disabled would still stand, given the evidence showing his inability to perform his occupation's cognitive requirements.

[16] In addition to Dr. Laich, the other doctors who reported a diagnosis or impression of radiculopathy or radiculitis are: Drs. Khan and Patel, AR 1596 (May 10, 2018, Radiculopathy, Lumbar Region); Dr. Chu, AR 1001 (June 15, 2018, Impression: Chronic Left Lumbosacral Radiculopathy); Dr. Khan, AR 1589 (June 21, 2018, Radiculopathy, Lumbar Region); Dr. Murphy AR 1580-81 (Oct. 4, 2018, Lumbar Radiculitis); Dr. Dahdaleh AR 2034 (Feb. 4, 2019, Lumbar Radiculopathy); Dr. Phillips, AR 1839 (April 16, 2019, Spinal Stenosis, Lumbar Region Without Neurogenic Claudication; noting also that "Mr. Snapper … obviously has a history of … progressive S1 radiculopathy"); Dr. Bouffard, AR 1649 (Jan. 20, 2020, Left S1 Radiculitis); Dr. Osborn, AR 875 (Jan. 13, 2020, Impression: Left S1 Radiculitis).

Region), with AR 1649 (Dr. Bouffard, Jan. 20, 2020, Left S1
Radiculitis). With the singular possible exception of Dr. Song
(whose observations are discussed more fully below), Unum has
failed to identify anyone who treated Snapper who expressed
doubts about the genuineness of his complaints of pain.

Snapper has pursued a wide range of treatments in an
attempt to address the pain. These include no fewer than five
epidural injections; the implantation of a stimulator in his
spinal column; and a variety of highly potent pain medications.
He has participated (albeit unsuccessfully) in multiple weeks-
long physical therapy programs; and he attempted (again, albeit
unsuccessfully) to participate in the AbilityLab's
interdisciplinary pain management program. Lastly, Snapper has
had three separate surgical operations to address his back and
left lower extremity pain. It is a testament to the seriousness
of his condition that Snapper opted to undergo the final two
surgeries even after several surgeons refused to perform them,
and indeed after being informed that the procedures had a low
chance of success and might actually worsen his pain.

The foregoing represents powerful evidence that Snapper is
disabled within the meaning of the Plan. Whether this evidence
outweighs Unum's contrary evidence is the question to which I
now turn.

**D.   Unum's Evidence and Counterarguments**

67

Unum summarizes its arguments and evidence as follows:

Snapper failed to meet his burden of proving, by a
preponderance of the evidence, that he satisfied the
Plan's definition of Disability beyond July 17, 2020,
based on (i) numerous inconsistencies in Snapper's
reported pain, including his July 24, 2020 "crescendo
of pain" in response to Unum's termination of
benefits, (ii) Snapper's willful noncompliance with
the AbilityLab's pain management program after just 1½
days, even though the program was prescribed by Drs.
Laich, Khan, and Chu, (iii) Dr. Song's assessment that
Snapper's pain behaviors were motivated and reinforced
by financial disincentives and psychological issues,
(iv) Snapper's physical activities, including swimming
3½ miles every other day, climbing the stair-master
for 20 minutes daily, and fly-fishing in remote
northern Michigan, even though he claimed to be unable
to sit, stand, or walk longer than a few minutes, (v)
Snapper's inconsistent clinical presentation,
including Dr. Laich's February 13, 2020 exam findings
of normal sensation in the left leg and along the S1
nerve, which was inconsistent with his clinical
presentation during Dr. Laich's July 24, 2020 exam,
(vi) the January 9, 2020 myelogram depicting "[n]o
abnormal motion" during "flexion or extension" of the
lumbar spine, (vii) the medical opinions of Drs.
Kirsch, Lewis, and Norris, and (viii) the fact that
Dr. Laich was the only physician to endorse Snapper's
disability claim.

Def.'s Reply Br. 12-13.

While Unum's arguments on these points are not entirely
without merit, they ultimately are unpersuasive. I discuss each
in turn.

**1.    The "Suspicious Timing" of Snapper's "Crescendo of Pain"**

Unum's lead argument rests on Snapper's description during
his July 24, 2020, appointment with Dr. Laich that his leg felt
like a "crescendo of pain." According to Unum, this marks a

dramatic departure from Snapper's earlier characterizations of his pain. Given the timing—coming just a week after Unum had terminated his LTD benefits—Unum finds this inconsistency suspicious. As Unum puts it, "Snapper's pain complaints, which had diminished when he was receiving disability benefits from Unum, dramatically escalated within days of receiving Unum's determination that no further benefits were payable." Def.'s Br. 17.

The evidence does not support this argument. An examination of the record shows that Snapper's "crescendo of pain" description is no more dramatic than descriptions he provided of his pain on other occasions. During one appointment, for instance, Snapper reported that his pain was "like grabbing an electric fence." AR 1653 (Dr. Osborn notes dated 1/13/20). On another occasion, he stated that his leg felt as though it was "wrapped in a sleeve of numbness and burning as I am more active." AR 2615 (Dr. Laich notes dated 9/20/19). These descriptions came before Unum terminated his benefits on July 17, 2020. Hence, they cannot be viewed as a response to the termination. Snapper's "crescendo of pain" description is perhaps a bit more colorful than his other descriptions, but it is not so different as to indicate malingering.

Unum points to other details from the July 24, 2020, appointment in attempt to bolster its claim that Snapper sought

to exaggerate his pain. Specifically, Unum cites the fact that

"[r]ather than sitting and standing as in prior exams, Snapper

insisted on lying down on the exam table" during the July 24,

2020 appointment. Def.'s Resp. Br. 8. It is not entirely clear

that Snapper "insisted" on lying supine. Dr. Laich's notes say

only: "Interview and examination are primarily conducted with

Joseph Snapper resting supine on examination table per Joseph's

benefit." AR 3630. But even assuming that Unum is correct on

this point, it is incorrect to imply that this was the only

occasion on which Snapper expressed a preference for resting

supine. For example, on the first day of the AbilityLab pain

management program on January 20, 2020—months before his LTD

benefits were terminated—Occupational Therapist Alison Yum

reported that Snapper remarked: "Today is a bad day, I'm not

even sure I'm going to be able to get through the day. Reports

walking makes everything worse - even walking from front door to

elevator and the tour this morning flared his pain. If he

doesn't walk, then can sit for max 10 minutes." AR 893. Yum goes

on to note that Snapper "Spent> 30 minutes during session laying

supine on mat as patient states this is most comfortable

position." *Id*.[17] In fact, Snapper consistently told his various

---

[17] Snapper also needed to rest supine during his vocational interview
with Moglowsky on January 28, 2021. *See* AR 4514 ("Mr. Snapper leaned
off to one side while sitting, changed positions frequently, required
one break for several minutes during our meeting, and spent 30- minute
intervals of time lying on the floor, which he found to be more

healthcare providers that his symptoms were reduced when he was in the supine position. *See, e.*g., AR 3672 (Pennisi reporting in the PWPE that Snapper's "[s]ymptoms are reduced with lying supine …."). Snapper appears also to have rested in a supine position during his assessment with Dr. Osborn on January 13, 2020. *See* AR 874 ("Pain assessment …. Position changes from lying down to sitting during encounter."); AR 887 (PT Sarah Kranz-Owens notes dated 1/21/20 reporting "P verbalizing high pain 'I need to lie down' P stating he is not certain he will be able to make it through the day/program like this - 'too much sitting'").

A final problem with Unum's argument is that it was at the same July 24, 2020, appointment that Snapper informed Dr. Laich that he had spent time fishing in Michigan and had been able to use a stairmill for twenty minutes per day. As discussed more fully below, Unum points to these developments as evidence that Snapper's condition had vastly *improved*. If his intent had been to make his pain seem worse at the appointment, it would have made little sense for Snapper to have informed Dr. Laich of these activities.

In short, Unum's "crescendo of pain" argument fails.

---

comfortable in an attempt to alleviate symptoms, rather than sitting in a chair at my conference room table."). This was after Snapper's benefits were terminated; but it was so long after the termination that it is difficult to view it as a response to the termination.

## 2.   Noncompliance with the AbilityLab Pain Management Program

Second on Unum's list of counterarguments is Snapper's self-discharge from the AbilityLab's pain management program. Unum challenges Snapper's claim that he left the program because of severe pain. According to Unum, Snapper's explanation is belied by the fact that he did not seek medical treatment until February 13, 2020, when he was examined by Dr. Laich. According to Unum, this suggests that Snapper's pain was not that severe and that he lacked motivation to improve his condition.

But—putting to one side the question of whether it would have been possible for Snapper to meet sooner with Dr. Laich—it is unclear why Snapper should have needed immediate care. Snapper does not claim that he left the program because it was uniquely painful. Rather, it appears to have been the kind of intense pain that he had experienced on other occasions while engaging in certain types of physical activity. The difference appears to be that Snapper was unable to take pain medication prior to participating in the program. Snapper often reported that the only way he was able to participate in physical activities was by timing the taking of his medications either before or after the activity, *see, e.g.*, AR 3630 (Dr. Laich notes dated 7/24/20 stating that Snapper "relates that he is using Percocet to work out, 1-2 Percocet/day" and "Now swimming 3-1/2 miles and on stairmill x20 minutes. Pain medications need

to knock pain down"); AR 3674 (Pennisi reporting in the PWPE
that Snapper asked her to notify him "approximately 30 minutes
prior to the end of the evaluation at which time he took his
pain medication"); keeping the activity to a minimum, and
resting afterwards, *see, e.g.*, AR 1336-37 (Pennisi reporting in
the PWPE that Snapper "notes that he is able to complete grocery
shopping and personal errands when he parks nearby and uses a
cart for support" but "states that … he can only tolerate one
errand per day and must rest in a supine position afterwards").
The AbilityLab pain management program, however, consisted of
full-day sessions, over consecutive days, for a period of four
weeks, and involved a significant amount of physical activity. I
note that when Dr. Bouffard contacted Snapper after his failure
to show up on the third day of the program, Snapper explained
that he had taken a substantial amount of pain medication as a
result of the previous day's activities. In short, the record
evidence suggests that Snapper discharged himself from the
program not because it was more painful than usual, but because
the strategies he was able to use to treat pain on other
occasions were not effective for the AbilityLab program. The
fact that Snapper did not seek immediate medical care,
therefore, casts no doubt on his motivation to improve his
condition.

Unum also cites the fact that Snapper was described by some of the program's doctors as inattentive and, in some cases, argumentative and disrespectful. This is true, but it is only part of the story. Other professionals who worked with Snapper in the program reported that he was an active participant. *See, e.g.*, AR 928 (Psychologist Jennifer Sarna notes dated 1/20/20 reporting "Patient was an active participant in the group discussion and was observed to benefit from the information reviewed. asked appropriate questions and made comments that indicated understanding of the material"); AR 922 (Dr. Song's notes dated 1/20/20 reporting, "[t]he patient was an active participant in the group relaxation session, demonstrating the ability to remain focused. Breathing was observed to be slow and deep. Patient reported feeling more relaxed following the intervention"). More fundamentally, however, Unum fails to explain why Snapper's alleged poor attitude should be regarded as evidence against a finding of disability rather than in support of it. During his AbilityLab intake interviews, Snapper acknowledged that his pain often made him irritable and unpleasant. *See, e.g.*, AR 1646 (Dr. Song's notes dated 1/13/20 reporting Snapper's comment "I am an asshole all the time due to the pain"); AR 1653 (Dr. Osborn's notes dated 1/13/20 recording that Snapper replied "Yes to all," when asked "about depression, anxiety, and irritability related to his pain"). Further, the

74

notion that Snapper did not suffer from severe pain, or that he lacked motivation to improve it, is not easily squared with other evidence in the record indicating that Snapper was serious about improving his condition. As noted above, Snapper embarked upon physical therapy programs several times. And although none of these was ultimately successful in overcoming his pain, Snapper was able to achieve at least some of the goals he developed with his therapists. *See, e.g.*, AR 1720 (PT Gornick noting that Snapper met his goal of sleeping for at least 5 hours); AR 1723 (PT Gornick listing as "Met" the goal that "Pt will be independent with final home program").

On balance, the record suggests that Snapper was indeed serious about exploring different ways to treat his pain; that he made a good-faith effort to participate in the AbilityLab pain management program; and that his discharge from the program was due to intense pain rather than indifference. Notably, one of Snapper's abortive attempts at physical therapy took place in September 2020, *after* his discharge from the AbilityLab's pain management program. Given that Snapper's failure to complete the pain management program was among the reasons why Unum terminated his benefits, it appears unlikely that Snapper would drop out of physical therapy at the very time he was seeking to restore his benefits—unless he was indeed suffering from severe pain.

### 3.  Dr. Song's Notes Regarding Snapper's Motivation

Next, Unum relies on Dr. Song's notes from her AbilityLab intake interview with Snapper to suggest that he was malingering. Specifically, Unum refers to "Dr. Song's assessment that Snapper's pain behaviors were motivated and reinforced by financial disincentives and psychological issues." Def.'s Reply 12. Unum also asserts that "Dr. Song observed that Snapper engaged in dissembling behavior by voicing apprehension about taking opioids but continually turning to opioids as his go-to coping mechanism." *Id*. at 15.

I am unpersuaded. To begin with, Unum insinuates that Dr. Song's use of the term "pain behaviors" is inherently denunciatory—as though "behavior" in this context is roughly synonymous with "acting" or "affectation." Dr. Song's use of the term, however, is entirely neutral, and simply describes Snapper's physical bearing and demeanor during their meeting. Thus, for example, after writing in her notes that she observed Snapper "engaged in a number of pain behaviors during the hour long interview," Dr. Song adds by way of illustration that "he exhibited poor posture and sat and moved in a guarded fashion." AR 918. There is no indication that in speaking of "pain behaviors," Dr. Song meant to imply that Snapper's behaviors were contrived. Snapper's other healthcare providers likewise referred to "pain behaviors," and did so in a neutral manner.

76

*See, e.g.*, AR 890 (PT Kranz-Owens notes describing Snapper's "high pain behaviors" as "postural deviations significant for guarded and rigid trunk posture"). And while Unum itself characterizes Snapper's supposedly artificial "pain behaviors" as "extreme," Def.'s Resp. Br. 2, "excessive," *id*. at 21, and "exaggerated," Def.'s Reply Br. 6, it points to nowhere in the record where Dr. Song, or anyone else, uses these terms to describe Snapper's behavior.

The same is true of Unum's reference to "Dr. Song's assessment that Snapper's pain behaviors were motivated and reinforced by financial disincentives and psychological issues." Def.'s Reply 12. Although Dr. Song considered the possibility that Snapper had ulterior motives for these behaviors, her remarks on this point are speculative and tentative. *See, e.g.*, AR 918 ("*Possible* reinforcement for pain behaviors. STDI, channel for emotional distress, perceived justification opioid medications.") (emphasis added); AR 919 ("In addition, the pain problem *appears* to be reinforced and maintained, at least in part, by financial disincentives.") (emphasis added). Dr. Song never expressed a definitive assessment that Snapper's behavior was guided by ulterior motives. Still less does the word "dissemble" or any of its cognates appear in Dr. Song's notes (or the notes of any of Snapper's other healthcare providers, for that matter).

77

To the extent Dr. Song's notes reflect an element of skepticism, I do not accord them much weight. For one thing, Dr. Song's notes offer no insight into the basis for her remarks. For example, while she alludes to possible financial disincentives to Snapper's participation in the program, she does not explain what aspect of Snapper's presentation or medical history raised a red flag. As Snapper points out, if the possibility of obtaining disability benefits were a basis for questioning patients' motivation, it might well apply to virtually all of the program's participants. Next, Dr. Song's notes from a subsequent meeting with Snapper on January 20, 2020, contain the cryptic remark that Snapper "did disclose new secondary gain" and that she "[w]ill need to monitor intrinsic motivation for [treatment]." AR 926. Whatever this observation may mean, it offers scant support for Unum's argument, especially in view of Dr. Song's much more detailed notes memorializing Snapper's account of his pain. *See, e.g.*, AR 1699 (reporting Snapper's statement that, due to pain on the job, he "was at a hearing and 'couldn't remember a damn thing'"); AR 918 ("[T]he patient reports that the pain has had a negative impact on his lifestyle and level of functioning; he no longer works, socializes (states he does not want his friends, many of whom are colleagues, to see him on painkillers, limping, and 'sounding like an idiot.'"); AR 917-18 ("[Patient] [w]as in his

78

second year of law school at NU at the time [he first hurt his back] and attained disabled student status for the rest of his time there 'even as executive editor of the Law Review.'").

Unum also points to Dr. Song's notes concerning Snapper's use of pain medications. At one point, for example, she writes, "[t]he patient reports he is not using alcohol although may be using street drugs to help with pain, stress, and sleep." AR 919. But again, nothing in Dr. Song's notes indicates the basis for her speculation that Snapper might be using "street drugs." To be sure, Snapper reported to Dr. Song (and others) that he had tried to use marijuana to help with the pain, but he also reported that it was "useless," AR 919, and that he had stopped using it in December 2019, AR 868. Similarly, Dr. Song remarked that Snapper "reports he is not using prescribed medication inappropriately although seems to be struggling to ward off addiction based on the number of times he said he is afraid of opiates yet embrace them as his go-to strategy." AR 919. While Dr. Song's concern about Snapper's use of pain medications may have been appropriate, the record as a whole suggests that Snapper used Percocet as a *last* resort, not as his first line of defense. *See, e.g.*, AR 3137-38 (electronic message dated 2/12/19 from Snapper to Dr. Khan stating "I'm finding that if I need to actually try to do a couple things during the day, I can use the Nucynta and gut out the pain. If I'm really uncomfortable, then

I've been using the Percocet"). Indeed, the evidence suggests that Snapper used opioids sparingly not only out of fear of addiction but also because of their soporific side effects. *See, e.g.*, AR 314 (Dr. Jason Michaels notes dated 2/21/19 reporting that Snapper "does not take Percocet during the day because it makes him unable to work"). Further, it is unclear why Dr. Song should interpret Snapper's expression of concern about opioid addiction as evidence that he was "struggling to ward off addiction." It could just as easily be regarded as a sign of prudence on Snapper's part. Snapper discussed medications frequently with many doctors, yet, so far as the record reveals, none of them raised any suspicion regarding Snapper's use of opioids or other substances.

This suggests a final reason for according little weight to Dr. Song's speculation: she is the only individual in this voluminous record who examined Snapper and who even so much as speculated about his secondary motivations. Unum attempts in several places to attribute suspicion regarding Snapper's motives to the entire AbilityLab team. *See, e.g.*, Def.'s Resp. Br. 15. ("The multidisciplinary medical team at Northwestern's AbilityLab, however, extensively documented that Snapper lacked motivation to improve his reported pain due to financial disincentives and the desire for opioids."); *see also* Def.'s Resp. Br. 2 ("The medical team at the AbilityLab determined that

Snapper lacked motivation to improve his condition, and that his extreme pain behaviors were motivated by financial disincentives, including monthly disability benefits under Mayer Brown's Plan.").

In point of fact, however, none of the other doctors or therapists affiliated with the program ever intimated that Snapper's complaints of pain were manufactured or exaggerated. For example, Unum cites Dr. Bouffard's notes of January 22, 2020 to support the claim that, during his participation at the AbilityLab, Snapper "demonstrated noncompliant behavior, 'poor buy in and commitment to the program,' and a motive for financial gain." Def.'s Br. at 9 (citing AR 1644). It is true that Dr. Bouffard mentions Snapper's poor motivation; but she says nothing about Snapper having a secondary motive for financial gain. And Unum's statement that Psychologist Caryn Feldman "shared Dr. Song's assessment" that "Snapper engaged in dissembling behavior by voicing apprehension about taking opioids but continually turning to opioids as his go-to coping mechanism," Def.'s Resp. Br. 15, is simply inaccurate. As explained above, Dr. Song never "assessed" Snapper or determined that he was dissembling. Moreover, Unum points to no evidence that Dr. Feldman shared any skepticism Dr. Song might have harbored. Unum's citation to the record reflects only Dr. Feldman's report that Snapper was "not attentive," that he was

"argumentative and disrespectful," and that he demonstrated "poor acceptance and motivation." Def.'s Br. 15 (citing AR 3989-90). While these reflections are not flattering, they do not suggest dissembling or ulterior motives.

One final point is worthy of note regarding Unum's allegations of malingering. Unum's argument presupposes that Snapper sought to avoid working while still collecting a substantial portion of his salary. But the record in this case strongly suggests that Snapper enjoyed his work and had a successful career as an attorney at Mayer Brown. As recounted above, Snapper expressed distress to his doctors at the thought that he might not be able to return to work. *See, e.g.*, AR 2078 (electronic message from Snapper to Dr. Khan dated 1/15/19 stating, "Unfortunately, currently I am not doing particularly well. Due to the pain, I am struggling to sleep and stay at work. As before, my days in the work force feel very numbered"); *see also* AR 1566 (Dr. Khan notes dated 2/21/19 stating: "Overall, the patient feels like he is stressed out because his pain is not improving. He is concerned that he may have to live with this amount of pain for the rest of his life. He feels like his quality of life is very poor and he is unable to do the things he enjoys such as exercising, working, swimming"). Dr. Osborn's notes report that Snapper was in "shock" at the prospect of not working full-time. AR 1653. In the early phases

of his treatment, before the various interventions had proved unsuccessful, Snapper's aim, as noted by Dr. Hsu, was to return to work, and to do so without restrictions. *See* AR 2130 (Dr. Hsu notes dated 6/27/18 stating Snapper "would like to return to work at this time. We will return to work without restrictions"). Indeed, Snapper made returning to work one of the goals of his physical therapy. *See, e.g.*, AR 1766. Marjan Batchelor, his colleague from Mayer Brown, offered the following appraisal:

> Joe had a very promising career at Mayer Brown, and he loved the work. He is one of the few associates who didn't complain about his assignments, and instead seemed to find each one interesting and even a little fun. He is built for this type of work, and there was no doubt in anyone's mind that he would be promoted to partner in the next couple of years.

AR 1367.

In short, Dr. Song's notes do not, when viewed in the context of the record as a whole, persuade me that Snapper was malingering, or that his pain was exaggerated or manufactured.

## 4. Snapper's Physical Activities

Unum's next argument is that Snapper's claims of disability are refuted by his reported physical activities. Unum points out that, despite complaining of severe pain while standing, walking, or sitting, Snapper "exercised at the gym every day, including swimming 3½ miles and climbing the stair-master machine 20 minutes daily. He traveled to Michigan and enjoyed

83

boating and fly-fishing, activities that his angling companion "Captain" Stephen Pels described as 'typically' lasting '8 hours in duration' in remote rivers of northern Michigan and requiring prolonged standing." Def.'s Reply Br. 7. Although this argument has superficial appeal, it loses much of its force when the record is examined more closely. I consider Unum's argument with respect to each of the aforementioned activities separately.

      **a. Swimming**

Unum claims that Snapper's complaints of extreme lower extremity pain are belied by the fact that he was able regularly to swim 3.5 miles. At the outset, it is necessary to address a discrepancy in the record regarding the distance Snapper swam. The figure of 3.5 miles comes from a single reference in Dr. Laich's notes taken during his July 24, 2020 appointment with Snapper. *See* AR 3630. Snapper argues that this figure is incorrect, noting that swimming such a distance would be difficult even for experienced swimmers not hampered by pain. Given the facial implausibility of the 3.5 mile figure, coupled with the record's multiple indications that Snapper swam between 1000 and 1500 yards, *see, e.g.*, AR 866 (Dr. Bouffard); AR 3507 (Dr. Osborn), I assume that the latter is correct.

Unum contends that even swimming a distance of 1000-1500 yards is inconsistent with Snapper's reports of pain. For several reasons, I disagree. To begin with, I note that Snapper

himself reported his swimming activity. Indeed, he reported it
not only to Dr. Laich but also to Dr. Bouffard and Dr. Osborn at
the AbilityLab pain management program. If Snapper's intent had
been to dissemble, it would have made little sense for him to
engage in the exercise (and perhaps risk being caught), much
less inform his medical providers of his activity. Second, none
of Snapper's surgeons, doctors, or therapists suggested that his
swimming was inconsistent with his account of left lower
extremity pain or suggested that he stop the activity. On the
contrary, Snapper was prescribed aquatic therapy by Dr. Laich
and by his physical therapists. *See, e.g.*, AR 459 (Dr. Laich
notes dated 11/7/2019 referring Snapper to AbilityLab for
aquatic therapy); *see also* AR 952 (PT Nicholas Gornick notes
dated 12/9/19 stating "Pt continues to demonstrate good core
activation during core strengthening, and able to tol[erate]
various swimming techniques with no complaints of pain during
exercises. Pt will continue to benefit from continue aquatic
therapy to address deficits to aid in pain management and
increase tol[erance] to activities to improve functional
mobility"). Notably, while the aquatic therapy included
apparently simple pool exercises such as "nerve glides," it also
included freestyle swimming as well as the backstroke. *Id.*

Further, the record also indicates that Snapper took
various steps to minimize his pain. For example, he reported on

85

several occasions that, due to his lower leg pain, he did not kick while swimming. *See* AR 1497 (Dr. Chu notes dated 8/24/2020 recording Snapper's report that "he can swim without increased symptoms as long as he does not kick"); *see also* AR 3672 (Pennisi noting that Snapper "swims several days per week but states he must be very careful with rums or be will experience increased leg pain"). Notably, a declaration from Martin Laurence, a friend with whom Snapper swam for many years, states that Snapper used a buoy while swimming to help with the pain. *See* AR 1218 ("Over [the past three years] I began to notice [Joe] had a great deal of trouble walking. He said the only exercise he is able to do is to swim due to a chronic back issue which he has had surgeries on before. He indicated he hasn't been able to work because of it. I also noticed when he swims he has to use a swim buoy to raise his legs up. They are buoyant and people use them for working the upper body or when they have a weak kicks, leg and back injuries as well as other physical problems."). In addition to all of these measures, Snapper reported using Percocet in conjunction with his exercise activity to dull the pain. *See, e.g.*, AR 3630 (Dr. Laich notes dated 7/24/20 stating that Snapper "relates that he is using Percocet to work out, 1-2 Percocet/day" and "Now swimming 3-1/2 miles and on stairmill x20 minutes. Pain medications need to knock pain down"). And even after taking all of these steps,

swimming could still be very painful—in some cases, prohibitively so. *See, e.g.*, AR 981 (PT Megan Rao patient report dated 7/16/19 stating that Snapper "was swimming in the winter of last year but hasn't since due to pain").

In short, the significance of Snapper's ability to swim depends on many critical details. If one imagines the activity in the manner of competitive swimmers vigorously and rapidly completing laps and performing abrupt flip turns, it might indeed cast doubt on the severity of Snapper's actual pain. On the other hand, if one imagines Snapper swimming slowly and deliberately, using flotation devices, refraining from kicking his legs, performing the flip turns gingerly, using powerful pain killers, and even then sometimes still experiencing severe pain, the activity is consistent with Snapper's account of his pain. Because the record suggests the latter scenario, Snapper's swimming does not outweigh the evidence that his pain was indeed disabling.

### b. The Stairmill

Snapper's use of the stairmill is subject to much the same analysis as his swimming. As with swimming, Snapper openly reported his use of the stairmill. This is not a case in which an LTD benefits claimant was secretly surveilled and found to have been engaging in activity he claimed he was incapable of performing. On the contrary, Snapper reported his stairmill use

to Dr. Laich in July 2020. *See* AR 1280. He also later reported
it to Kristen Wu, one of his physical therapists, in September
2020. *See* AR 2198. Further, nothing in the record suggests that
Dr. Laich or PT Wu believed that Snapper's use of the stairmill
was contraindicated or was inconsistent with his complaints of
lower left leg pain. In fact, like swimming, "stair training"
was part of Snapper's physical therapy at the AbilityLab in
September 2020. *See, e.g.*, AR 2202; AR 2388.

Moreover, Snapper made clear that using the stairmill was
extremely painful, *see, e.g.*, AR 2198 (PT Kristen Wu's notes
indicating that, at its worst, Snapper's pain was 8/10 his worst
and citing the stairmill as an example), and that he was able to
use the stairmill only by routinely using Percocet to dull the
pain, *see, e.g., id.* (PT Kristen Wu notes reporting "Stair mill
for strengthening - 20 minutes, every day after taking pain
killers"). Further, Snapper reported being essentially out of
commission for long periods after engaging in physical
activities. AR 1336-37 (Pennisi reporting in her PWPE that
Snapper "notes that he is able to complete grocery shopping and
personal errands when he parks nearby and uses a cart for
support" but "states that … he can only tolerate one errand per
day and must rest in a supine position afterwards"); AR 2198 (PT
Kristen Wu notes stating that Snapper "has tried several short
bouts of PT, which … have left him with the debilitating pain x

4 days at a time"). The record suggests that after using the
stairmill, Snapper returned home and essentially lay supine for
much of the rest of the day. When viewed in this light,
Snapper's use of the stairmill is compatible with his complaints
of severe left lower extremity pain.

### c.    Fly Fishing in Michigan

The final activity that Unum cites as evidence against a
finding of Snapper's disability is what it describes as a
"boating and fishing vacation" in Michigan. Def.'s Resp. Br. 2.
Unum suggests that the fishing expedition lasted for eight
hours, that the trip took place in the "remote waters of
northern Michigan," and that the fishing "require[ed] prolonged
standing." Def.'s Reply Br. 7. Once again, Unum's
characterization is misleading.

The only evidence in the entire record regarding the July
2020 fishing trip consists of a single notation in Dr. Laich's
notes from his July 24, 2020, appointment Snapper: "Spent time
on boat and fishing in Michigan." AR 3630. Unum's suggestion
that the fishing lasted for eight hours and that it involved
standing for long periods is based on the declaration submitted
by Snapper's fishing companion, Captain Steven Pels. AR 1206.
But as Unum itself points out, Pels's declaration does not
specifically concern the July 2020 trip. Reply Br. 7 n.3.
Rather, Pels recounts his relationship with Snapper going back

several years and discusses their fishing excursions only in general terms. While Pels indeed states that past fishing trips could last for eight hours, there is no basis for thinking that was true of the July 2020 trip.

On the contrary, Pels's declaration speaks at length about how limited Snapper's participation in the fly-fishing trips had become over time. Pels states that Snapper was in constant pain during the trips; that he was impaired both mentally and physically; that he needed to take frequent breaks and to alternate between standing and sitting; that he required pain medication; and that even then, Snapper usually needed to quit early. "During our trips together," Pels avers, "Joe would start to lose energy and strength early in the day, having to stop periodically to rest his leg. His head would hang low as he would try to hide his pain. During a majority of our trips, Joe would let me know that he couldn't continue any longer and we would end the trip early." *See* AR 1205; *see also id.* ("Upon meeting Joe I noticed his major discomfort both with his leg and his back. He would wince and breathe heavily but typically try to hide it and fight through the pain. Additionally, over time, I could tell Joe's mental capacity seemed impacted in mood, concentration and short-term memory."); AR 4514 (Moglowsky reporting Snapper's statement that he was "down" for three or four days after a fishing trip in November 2020 due to extreme

90

pain). Simply put, Unum's characterization of the July 2020 fishing trip and its physical demands is not supported by the record.

Beyond this, fly-fishing was among Snapper's physical therapy goals. *See, e.g.*, AR 899 (OT Alison Yum's notes from 1/20/2020 listing Snapper's goals as "sit tolerance for functional activities, stand tolerance for productive activities, walk to gym, drive long distance, and fly fishing"). And also, as with other activities, Snapper himself reported the trip to Dr. Laich, and he did so just after learning that Unum had discontinued his LTD benefits. Once more, if Snapper's strategy had been to malinger, mentioning the fishing outing would have made little sense.

For these reasons, none of the activities mentioned in Dr. Laich's notes from the July 24, 2020, visit constitutes significant evidence against a finding that Snapper was disabled.

## 5. Inconsistent Presentation

Next on its list of bases for disputing Snapper's disability, Unum cites Snapper's "inconsistent clinical presentation." The chief example it discusses, however, is the fact that Snapper reported normal sensation at all levels of his spine during a pin-prick test conducted by Dr. Laich on February 13, 2020. When the test was conducted on July 24, 2020, Unum

points out, Snapper reported a loss of sensation at the L4, L5, and S1 regions of the lumbar spine. *See* Def.'s Reply Br. 8. The relevant portions of Dr. Laich's notes from both exams are reproduced below:

| February 13, 2020 Sensation (Lumbar Left) | July 24, 2020 Sensation (Lumbar Left) |
|---|---|
| L1: *Normal* | L1: *Normal* |
| L2: *Normal* | L2: *Normal* |
| L3: *Normal* | L3: *Normal* |
| L4: *Normal* | L4: *Decreased* |
| L5: *Normal* | L5: *Decreased* |
| S1: *Normal* | S1: *Decreased* |

AR 4079; 3634.

There is no narrative or discussion in Dr. Laich's notes regarding either exam individually, nor any discussion comparing the two results. Beyond pointing out the difference between the two exams, Unum itself offers little discussion of it. Indeed, Unum ignores the fact that the pin-prick test was performed on Snapper on several other occasions, with varying results. For example, when Dr. Laich performed the test on May 23, 2019, all results were normal, just as was the case on February 13, 2020. On August 29, 2019, the result was "Normal" for L5, but "Decreased" for S1. AR 398. And on November 7, 2019, the results were "Decreased Mild" for L4, "Decreased Improved" for L5; and "Decreased Improved" at S1. AR 364. Nothing in the record explains the variations in these results, and Unum has made no attempt to do so. Without further discussion of the pin-prick

test and how its results are to be interpreted, Unum's unadorned observation of discrepancies between the February 13, 2020, test and the July 24, 2020, test does not undermine Snapper's case.

**6.    The January 9, 2020, Myelogram**

Unum next cites the myelogram taken on January 9, 2020, as evidence that Snapper's disability had resolved. Unum points out that the myelogram depicted "'[n]o abnormal motion' during 'flexion or extension' of the lumbar spine." Def.'s Reply at 12-13. But Unum does not explain why the lack of abnormal motion in Snapper's lumbar spine is inconsistent with Snapper's reported leg pain. Further, Unum glosses over other findings from the January 9, 2020, exam that would appear equally significant and potentially support Snapper. In particular, the myelogram found "mild degenerative disc space narrowing at L4/5 and L1/2." AR 3504. Unum's mere citation to the January 9, 2020, myelogram does not cast significant doubt on Snapper's case.

**7.    Unum's Doctors**

Unum additionally refers to the medical opinions of Drs. Kirsch, Lewis, and Norris as evidence against Snapper's disability. Many of the issues raised in the doctors' reports have already been discussed and need not be revisited here. For example, all three doctors opined that Snapper's reported exercise activities are inconsistent with his claims of extreme left lower extremity pain. Accordingly, I address only the

residual issues raised in the medical opinions of Drs. Kirsch and Norris.[18]

### a. Dr. Kirsch

As noted above, Dr. Kirsch's report purported to identify several types of evidence in support of his conclusion that Snapper's symptoms were inconsistent with the medical information in its claim file: Snapper's reported improvement in symptoms; limited diagnostic test findings; and limited treatment intensity. As explained below, the arguments that Dr. Kirsch sets forth under these headings are either unconvincing or are, at best, of peripheral importance.

**Reported Improvement in Symptoms**

With respect to Snapper's reported improvement, Dr. Kirsch cites the fact that Snapper reported "less cramping and numbness" at his November 7, 2019, appointment with Dr. Laich. AR 1125; Def.'s PFF ¶ 44. As Dr. Kirsch himself notes, however, Snapper still described his pain that day as "severe" and rated it 7/10. Moreover, Dr. Kirsch overlooks the fact that, after commenting on Snapper's reduced numbness, Dr. Laich's notes state: "The numbness will increase with increased activity." AR 1623. Any improvement here appears modest at best.

---

[18] It is unnecessary separately to discuss Dr. Lewis's opinion because her role was essentially to conduct a second-order review of Dr. Kirsch's opinion, so her report and Dr. Kirsch's cover the same ground.

Similarly, Dr. Kirsch cites the fact that during Snapper's February 13, 2020, appointment, Dr. Laich reported: "left lower extremity symptoms have improved in addition to his ability to sleep." AR 1637. This is true as far as it goes, but it omits the fact that Snapper indicated during the appointment that "Pain limits me to less than 4 hours of sleep." *Id*. Additionally, Dr. Laich's notes make clear that Snapper still rated his pain as "Fairly severe." *Id*. Thus, while the record indicates some degree of improvement with respect to sleep, it is relatively modest and does not represent a vast improvement in Snapper's overall level of pain.

**Limited Diagnostic Findings**

As examples of the purportedly limited diagnostic findings in Snapper's records, Dr. Kirsch first observes that "Radiographs obtained on January 9, 2020 revealed hardware in good alignment with no abnormal motion noted." AR 1125. However, as previously noted, the test also showed show abnormal results, such as "mild degenerative disc space narrowing at L4/5 and L1/2." AR 3504. Moreover, Dr. Kirsch acknowledged additional findings in other diagnostic tests that appear to support Snapper. For example, Dr. Kirsch observes that Snapper's February 3, 2020, MRI "revealed an annular tear and mild progression of the L4-5 height loss. Neural foraminal narrowing noted at L4-5 and L5-S1 was rated mild to moderate on the right

95

and minimum to mild on the left[.]" AR 1125. Dr. Kirsch also acknowledged that the CT/myelogram taken on February 13, 2020, revealed equivocal left nerve root contact with osteophyte and dilated root sleeve cyst in the L2-L3 foramen." *Id*. Unum makes no mention of these findings. I conclude that merely noting the good alignment of Snapper's hardware and the lack of abnormal motion does not significantly undermine the evidence supporting Snapper's overall disability.

**Limited Treatment Intensity**

Under the heading of "treatment intensity," Dr. Kirsch points out that in January 2020, Snapper's gabapentin was decreased to 600 mg 3 times a day and Percocet 10/325 twice a day; but that in May 2020, Snapper was taking Percocet once per day as needed. Dr. Kirsch apparently regarded this as evidence of a decrease in the severity of Snapper's pain. He ignores the fact that Snapper's medication changes often were driven by a concern over their cognitive side effects, and he fails to consider the possibility that it was a concern over drowsiness or fogginess, rather than a decrease in pain severity, that explains the reason for the medication reduction. Further, Dr. Kirsch neglects the fact that, while Snapper's Percocet was indeed reduced in May 2020, his gabapentin was increased at the same time to 600 MG four times per day. AR 1082. (Although Dr. Kirsch acknowledges the increase elsewhere in his report, he

omits it in this connection). I also note that, by September 2020—after Dr. Kirsch's report—Dr. Khan increased Snapper's Percocet from 5/325 to a stronger dose of 10/325, and increased the frequency from once every twelve hours to once every eight hours. AR 1907. While Dr. Kirsch cannot be faulted for being unaware of the latter medication change, it is nonetheless part of the record before me, and it undermines his contention that changes to Snapper's medications evidence limited treatment intensity.

   **b.  Dr. Norris**

   In contrast to Dr. Kirsch and Dr. Lewis, who reviewed the medical records in connection with the initial decision to terminate Snapper's benefits, Dr. Norris reviewed the materials during Snapper's administrative appeal. As a result, more information was available to him than to the other doctors. While Dr. Norris's opinion is somewhat more extensive than Dr. Kirsch's, it does not outweigh the evidence supporting a finding of disability.

   A central problem with Dr. Norris's opinions is that, at least with respect to some issues, they are presented at such a level of generality that they are virtually impossible to assess. For example, Dr. Norris asserts that "postoperative imaging did not identify evidence of moderate or severe neuroforaminal/central canal stenosis commensurate with the

97

degree of impairment reported by [Snapper]." AR 4442. However, neither Dr. Norris nor Unum explains the severity of stenosis that would be consistent with Snapper's claimed level of impairment. Nor, more fundamentally, does Dr. Norris or Unum address the evidence that radiographic and electrodiagnostic imaging may be unable to detect conditions such as radiculopathy. *Cf. Cox v. Astrue*, No. CV 11-10433-SP, 2012 WL 5467803, at *7 (C.D. Cal. Nov. 9, 2012) ("The EMG did not detect indicators of neuropathy involving the motor portion of the cervical and lumbar nerve roots or in the lower extremities. Dr. Tabibian noted, however, that he could not rule out radiculopathy on the basis of normal EMG findings because EMG does not detect all forms of radiculopathy.") (citations omitted). Similarly, Dr. Norris mentions variable "sensory findings" and inconsistent "motor deficit patterns," but he does not discuss the significance of these observations.

The abstruse character of Dr. Norris's opinions on these points is of particular concern here because many of his opinions regarding more pedestrian issues are plainly incorrect. For example, Dr. Norris mistakenly asserts that Snapper discontinued the AbilityLab pain management program due to COVID restrictions, not as a result of pain. On this basis, Dr. Norris identifies a supposed inconsistency between Snapper's resumption of appointments with other doctors but not with the pain

management program, then apparently leaps to the conclusion that Snapper was malingering. *See id.* ("Records indicate that the insured self-discontinued participation in a comprehensive Pain Medicine program, citing COVID restrictions. However, records do not indicate that the EE attempted resumption of the comprehensive program at a later time. Given that EE resumed other medical appointments in Aug/Sep 2020, it would be expected that he would have resumed the Pain Medicine program (started Jan 2020), since his initial participation was very brief."). But as Dr. Norris's observations on this point are entirely based on an erroneous premise, I accord them no weight.

Similarly, like Dr. Kirsch, Dr. Norris opines that Snapper's treatment after February 2020 "remained conservative and generally stable." In particular, Dr. Norris states that little attempt was made to adjust Snapper's medications after this date. *See* AR 4442 ("Records indicate that the insured required only minimal amounts of narcotic medication for prn use, and there was no evidence of an escalating use pattern. The insured reported sedation related to gabapentin after the claim closed and failed a trial of Lyrica. However, there were no subsequent attempts to modify dosing or try alternative agents; such actions would have been expected if there were ongoing clinical or functional concern regarding impairing gabapentin side effects."). According to Dr. Norris, the lack of more

aggressive treatment indicates that Snapper's condition is not as serious as Snapper contends.

Here, too, Dr. Norris's argument is based on a mistaken view of the record. Although Dr. Norris says that Snapper had expressed concern about gabapentin's sedative effects after his claim closed, Snapper had actually reported this concern as early as May 2018. *See* AR 346 (Dr. Khan's notes dated 5/10/18: "Patient is concerned about the sedation aspect of Gabapentin"); AR 338 (Dr. Khan notes dated 6/21/18: "Taking gabapentin, but notes excessive sedation"). Furthermore, once Snapper became concerned about the problem of drowsiness, he and his doctors did exactly what Dr. Norris says would have been expected: they tried multiple alternative medications. Although Dr. Norris suggests that Lyrica was the only alternative that Snapper tried, the record shows that Snapper also tried many others, including Cymbalta, Neurontin, Nucynta, and Amitriptyline. To the extent that Snapper made fewer attempts to find alternatives to gabapentin after February 2020, that may well have been because he had already tried so many other alternatives. As for Dr. Norris's assessment that Snapper's narcotic use was "minimal" and showed no evidence of an "escalating pattern," the record contains overwhelming evidence that Snapper tried to limit his opioid use out of concern about addiction and side

effects, even if taking greater amounts of Percocet could have more effectively kept his pain at bay.

For these reasons, Dr. Norris's medical opinions, like Dr. Kirsch's, are unpersuasive.

8. **Dr. Laich as the Sole Physician to Endorse Snapper's Disability Claim**

Unum's final argument is that Dr. Laich was the only physician to endorse Snapper's disability claim. *See* Def.'s Reply 11 ("Notably, Dr. Khan and Dr. Chu never opined that Snapper was disabled and never supported his disability claim. The AbilityLab's Dr. Bouffard, Dr. Song, and Dr. Feldman never opined that Snapper was disabled and never supported his disability claim."). While true, this assertion is potentially misleading, as Unum presents no evidence that Snapper's other doctors were asked to opine on the question of his disability, much less any reason to believe that they would have arrived at a different conclusion than Dr. Laich. At any rate, Dr. Laich was the physician most involved in Snapper's care during the relevant period. Given that he performed two separate surgeries on Snapper, his opinion regarding Snapper's condition is arguably the most important.

Unum observes that the "Seventh Circuit has long recognized that the opinions of personal physicians regarding their patients' alleged disabilities are often biased in the patient's

favor, making those opinions less trustworthy.'" Def.'s Reply
Br. 12 (quoting *Kuznowicz v. Wrigley Sales Co., LLC*, No. 11 C
165, 2013 WL 4052381, at *17 (N.D. Ill. Aug. 12, 2013)). But it
offers no evidence suggesting that *in this case*, bias played a
role in Dr. Laich's assessment. Accordingly, its argument is
unpersuasive.

In sum, having reviewed the administrative record and
considered the parties' briefs and proposed findings of fact and
conclusions of law, I conclude that Snapper has shown by a
preponderance of the evidence that Unum improperly determined
that he was no longer disabled within the meaning of the Plan.

**REMEDY**

Having concluded that Snapper has established that he was
disabled under the Plan at the time that his benefits were
terminated, I turn now to the question of remedy. Snapper
requests an "order reinstating his benefit claim and directing
payment of all past-due benefits." Pl.'s Br. 21. However,
neither he nor Unum addresses the issue of the proper remedy in
sufficient depth. Indeed, Snapper passes over the issue
altogether and simply includes the request for reinstatement and
back benefits in his conclusion. Unum discusses the issue only
in its Reply Brief; and rather than addressing the issue
squarely, it contends that Snapper's request for reinstatement
of his benefits actually constitutes an additional reason why

102

his motion must be denied. According to Unum, reinstatement of benefits "is the remedy when an administrator vested with discretionary authority arbitrarily and capriciously terminates benefits," whereas under "the de novo standard, Snapper must prove he satisfied the Plan's definition of Disability with medical evidence each month in which he seeks payment of benefits." Def.'s Reply Br. 2. Unum further argues that Snapper has presented no evidence showing that he was disabled at any time after his benefits were terminated. Thus, Unum maintains, even if Snapper has established that he was disabled at the time Unum terminated his benefits, he is not entitled to relief.

The question of the proper remedy in this case is slightly complicated. "Under ERISA, remedies are based on equitable principles and therefore courts have discretion to fashion an appropriate remedy in any given case." *Williams v. Grp. Long Term Disability Ins.*, No. 05 C 4418, 2006 WL 2252550, at *9 (N.D. Ill. Aug. 2, 2006) (citing 29 U.S.C. § 1132(a)(3)). Typically, the question is whether the case should be remanded to the plan administrator for further proceedings or whether the claimant's benefits should be retroactively reinstated. *See, e.g.*, *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003). The Seventh Circuit has further explained that "in answering this question a distinction must be noted between a case dealing with a plan administrator's

initial denial of benefits and a case where the plan administrator terminated benefits to which the administrator had previously determined the claimant was entitled." *Id*. "The distinction focuses on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination." *Id*. at 776. "In a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place." *Id*. "On the other hand are cases where the plan administrator terminated benefits under defective procedures. In these cases the status quo prior to the defective procedure was the continuation of benefits. Remedying the defective procedures requires a reinstatement of benefits." *Id*.

The problem is that, as *Hackett* illustrates, the question concerning the proper remedy in these cases has generally arisen in the context of arbitrary and capricious review, where a claimant's benefits have been denied or terminated due to procedural defects. In this case, the problem is not defective procedures. To restore the status quo in Snapper's case, remand would not be helpful, as I have already determined that Snapper has shown that he is entitled to benefits under the Plan. The remedy that most closely approximates the status quo in this

case is reinstatement. And despite Unum's insistence to the contrary, reinstatement is not exclusively reserved for instances in which an administrator arbitrarily and capriciously terminates benefits. Courts in this Circuit and elsewhere have ordered reinstatement and back benefits as the remedy in cases involving de novo review. *See, e.g.*, *Billings v. UNUM Life Ins. Co. of Am.*, 459 F.3d 1088, 1097 (11th Cir. 2006) (affirming district court's reinstatement of benefits under de novo review on the ground that "although there was no evidence in the record that Billings continued to suffer a disability during the period between the last day of trial and the day the district court entered judgment, there was also no evidence before the district court indicating that Billings's condition had improved during such time period"); *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 496 (E.D. Pa. 2021) (awarding plaintiff past-due LTD benefits under de novo review, reasoning that lack of evidence of plaintiff's continuing disability was lacking "precisely because Defendant improperly denied her benefits in the first place"); *Knox v. United of Omaha Life Ins. Co.*, 357 F. Supp. 3d 1265, 1268 (M.D. Ga. 2019) ("If Plaintiff proves his claims by a preponderance of the evidence, the Court must determine that United's decision to deny him benefits was de novo wrong. If the Court makes that determination, it has discretion in fashioning an appropriate remedy, which may

include reinstating benefits retroactively.") (citation omitted); *Druhot v. Reliance Standard Life Ins. Co.*, No. 16-CV-2053, 2017 WL 4310653, at *11 (N.D. Ill. Sept. 28, 2017) ("The parties agree … that the de novo standard applies here. Where the court looks at the question of entitlement to benefits de novo, the question before the district court was not whether the plan administrator gave claimant a full and fair hearing or undertook a selective review of the evidence; rather, it was the ultimate question of whether claimant was entitled to the benefits he sought under the plan. As the court has resolved that ultimate question rather than found a procedural violation, returning the parties to the status quo entails reinstating Druhot's benefits.") (citation and quotation marks omitted); *Figueiredo v. Life Ins. Co. of N. Am.*, 709 F. Supp. 2d 144, 156 (D.R.I. 2010) ("This Court, after conducting a de novo review of the administrative record, has determined that Figueiredo was denied benefits to which she was entitled under the Plan. Therefore, it is appropriate to award those benefits to her retroactively and, unless she fails to demonstrate her disability in the future, on a continuing basis."); *Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, 581 F. Supp. 2d 403, 412 (E.D.N.Y. 2008) (ordering retroactive reinstatement of benefits under de novo review).

There is some merit to Unum's complaint concerning the lack
of record evidence showing that Snapper has remained disabled
following its termination of his benefits. But this point was
convincingly addressed by the First Circuit in *Cook v. Liberty
Life Assurance Company of Boston*, 320 F.3d 11 (1st Cir. 2003).
There, the defendant terminated the plaintiff's benefits, which
she had received for three years, after determining that she was
no longer disabled within the meaning of the LTD plan. *Id.* at
13. The district court concluded that the termination was
arbitrary and capricious and awarded the plaintiff back benefits
for forty-two months—the period between the improper denial of
her benefits and the court's entry of judgment in her favor. *Id.*
at 23. The First Circuit affirmed. On appeal, the defendant
argued that the district court should have remanded the matter
to allow the plan to determine whether the plaintiff was
disabled during the pendency of the period in question. *Id.* at
24. The court rejected the argument, explaining:

> Liberty argues that there is no evidence of Cook's
> disability status after October 1998, when it
> terminated her disability benefits, and hence no basis
> for awarding her disability benefits past that date.
> However, the absence of information about Cook's
> disability status resulted directly from Liberty's
> arbitrary and capricious termination of her benefits.
> As a recipient of disability benefits, Cook was under
> a continuing obligation to adduce proof of her
> disability pursuant to the long-term disability plan.
> Once Liberty terminated her benefits, she was no
> longer obliged to update Liberty on her health status.
> It would be patently unfair to hold that an ERISA

> plaintiff has a continuing responsibility to update
> her former insurance company and the court on her
> disability during the pendency of her internal appeals
> and litigation, on the off chance that she might
> prevail in her lawsuit. Moreover, as the district
> court notes in its decision, reconstruction of the
> evidence of disability during the years of litigation
> could be difficult for a recipient of long-term
> disability benefits wrongly terminated from a plan.

*Id.* at 24-25.

To be sure, *Cook* was decided under the arbitrary and capricious standard. But—with the exception of *Druhot*, which does not address the issue in detail—the cases cited above have concluded, and I agree, that the principle articulated in *Cook* applies with equal force under circumstances such as those present here: given that Snapper's benefits were improperly terminated by Unum, it would be unfair, as well as impracticable, to require him to continue providing Unum with evidence of his disability. Moreover, the logic of Unum's argument, together with the fact that it has not acknowledged the possibility of any alternative remedy in this case, suggests that individuals in Snapper's position are simply without remedy. That result is unacceptable.

For these reasons, I conclude that Snapper is entitled to reinstatement and an award of past-due benefits from the date of his termination (July 17, 2020) to the date of this order. This of course does not mean that Snapper is entitled to coverage under the Plan indefinitely. Unum may continue evaluating

Snapper's condition to determine whether he remains disabled within the meaning of the Plan.

## ATTORNEYS' FEES

In the conclusion to his Rule 52 motion, and in his Response Brief, Snapper asks for an award of attorneys' fees and costs. *See* Pl.'s Br. 21; Pl.'s Resp. Br. 19. "ERISA allows a court, in its discretion, to award 'a reasonable attorney fee and costs of action to either party.'" *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wisconsin, Inc.*, 657 F.3d 496, 505 (7th Cir. 2011) (quoting 29 U.S.C. § 1132(g)(1)). However, neither Snapper nor Unum has offered any substantive argument on this issue. The Seventh Circuit has recognized two separate tests for determining whether attorneys' fees should be awarded in ERISA cases, both of which require consideration of multiple factors. *Id*. at 505-06. In the absence of any advocacy from the parties on the question, I shall reserve ruling on the issue. However, Snapper may file a separate motion for attorneys' fees and costs within 21 days of the date of this order. At that time, a decision can be made regarding further briefing on the issue.

## CONCLUSION

For the reasons discussed above, I grant Snapper's motion for judgment [30] and deny Unum's motion for judgment [38]. Snapper's request to take judicial notice [31] is denied.

109

Snapper's long-term disability benefits are reinstated and he is entitled to past-due benefits from the date Unum terminated his benefits to the date of this order. If Snapper wishes to recover attorneys' fees, he must file a motion with appropriate briefing of the matter within 21 days of the date of this order.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated:   March  16 , 2023